Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-20848
CV-Gayles

FILED by PE D.C.
MAR 0 6 2017
STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Federal Trade Commission,**

    Plaintiff,

v.

**World Patent Marketing, Inc.**, a Florida corporation;

**Desa Industries, Inc.**, also doing business as World Patent Marketing, a Delaware corporation; and

**Scott Cooper**, individually and as an owner and officer of World Patent Marketing, Inc. and Desa Industries, Inc.,

    Defendants.

**FILED UNDER SEAL**

MAGISTRATE JUDGE
TURNOFF

**COMPLAINT FOR PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF**

    Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

    1.    The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**INTRODUCTION**

    2.    For the last three years, Defendants have operated an invention-promotion scam that has bilked thousands of consumers out of millions of dollars. Defendants promise consumer inventors a patent and a lucrative licensing or manufacturing agreement that will allow consumers to successfully monetize their inventions. Defendants craft their marketing materials to create the impression that they have successfully helped other inventors, and thus that they are

1

reliable and reputable. In truth and in fact, Defendants fail to fulfill almost every promise they make to consumers. After Defendants collect thousands of dollars from consumers and string them along for months or years, Defendants fail to provide third-party licensing or manufacturing agreements, and their customers do not make money as a result of Defendants' purported research, patenting, and invention-promotion services.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

5. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

6. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b).

## DEFENDANTS

7. Defendant World Patent Marketing, Inc. is a Florida corporation with its principal place of business at 1680 Meridian Avenue, Suite 600, Miami Beach, Florida. World Patent Marketing transacts or has transacted business in this district and throughout the United States and internationally. At all times material to this Complaint, acting alone or in concert with others, World Patent Marketing has advertised, marketed, distributed, or sold research, patenting, and invention-promotion services to consumers throughout the United States and internationally.

8. Defendant Desa Industries, Inc., also doing business as World Patent Marketing, is a Delaware corporation with its principal place of business at 1680 Meridian Avenue, Suite

600, Miami Beach, Florida. Desa Industries transacts or has transacted business in this district and throughout the United States and internationally. At all times material to this Complaint, acting alone or in concert with others, Desa Industries has advertised, marketed, distributed, or sold research, patenting, and invention-promotion services to consumers throughout the United States and internationally.

9. Defendant Scott Cooper is an owner and officer, and founder and CEO, of World Patent Marketing and Desa Industries. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of World Patent Marketing and Desa Industries, including the acts and practices set forth in this Complaint. Defendant Cooper resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States and internationally.

10. Defendants World Patent Marketing and Desa Industries (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below. Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Scott Cooper has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

11. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

12. Since approximately February 2014, Defendants have marketed and sold research, patenting, and invention-promotion services to inventors who want to profit from their ideas for inventions.

*Defendants' Misrepresentations in Marketing*

13. Defendants have marketed their purported research, patenting, and invention-promotion services through, among other things, advertisements on television and the internet, telemarketing, and correspondence and contracts sent through the United States mail and e-mail.

14. Defendants have maintained a website that features "success stories" of inventions that Defendants have purportedly promoted successfully, including "Teddie's Ballie Bumpers," "Live Expert Chat," and "Supreme Diva Jeans." Defendants' website also contains purported favorable testimonials from inventors and a form to submit invention ideas to Defendants.

15. In truth and in fact, many of the inventors featured in Defendants' "success stories" have not had success with Defendants, and the favorable testimonials on Defendants' website were written by consumers shortly after purchasing from Defendants, before the consumers had an opportunity to evaluate Defendants' fulfillment of their promises.

*Defendants' Misrepresentations in Making Sales*

16. Most consumers' first substantive communication with Defendants is a phone call with one of Defendants' salespeople. This call may be initiated by consumers in response to Defendants' advertising, or it may be initiated by Defendants in response to consumers providing their contact information on a form on the Defendants' website or elsewhere.

17. On these initial calls, consumers describe their invention ideas to Defendants' salespeople, who almost invariably tell consumers that they have great ideas. Salespeople usually then explain that Defendants' "Board" or "Team" needs to approve ideas before moving forward, and ask consumers to submit written descriptions and drawings of their inventions for Defendants' further review.

18. A few days after consumers submit their ideas in writing, salespeople typically call consumers and inform them that Defendants have accepted their inventions, and reiterate that they are great ideas. Salespeople ingratiate themselves with consumers and build up consumers' confidence through praise for their ideas. Salespeople represent that if consumers buy Defendants' invention-promotion services, consumers are likely to realize financial gain by licensing their future patents, or through the manufacture, distribution, and sale of their inventions in well-known stores, including Walmart. Salespeople often make projections about how much money consumers will make. Salespeople may also talk about the good consumers' inventions could bring to society.

19. Salespeople also promote Defendants' performance record, claiming that Defendants have successfully marketed the inventions of many of their customers and secured licensing or marketing agreements for them. Salespeople create the impression that Defendants are reputable, citing the testimonials on Defendants' website and the Better Business Bureau's favorable rating of the Corporate Defendants. Salespeople also may create the impression that Defendants are successful businesspeople, referring to Defendant Cooper's yacht and luxury cars.

20. Salespeople typically tell consumers that in order to continue the process, consumers must spend up to $1,295 for a "Global Invention Royalty Analysis" or similar report. Salespeople tell consumers that this report will contain research from purported experts, supposedly including experts from major universities, who will evaluate the patentability and marketability of consumers' ideas.

21. If consumers agree to purchase a Royalty Analysis or similar report, consumers sign an agreement with Defendants and pay for a report. They then wait several weeks for the reports to arrive.

22. When consumers receive them, the reports invariably conclude that consumers' ideas are patentable and marketable. The reports, which are usually around seventy pages,

5

include, among other things, a patent search, market demographics, and a study purportedly conducted by Ivy League researchers.

23.     Defendants' salespeople then call consumers again to discuss the report. Salespeople continue to raise consumers' expectations by reiterating the representations made on the previous call—that if consumers buy Defendants' invention-promotion services, consumers are likely to realize financial gain by licensing their future patents, or through manufacturing of their inventions. If the report "scores" consumers' inventions, salespeople describe it as a good score. Salespeople also continue to build up consumers' impressions of Defendants' success, reputation, and prosperity.

24.     Salespeople then typically pitch various "packages" to consumers, ranging from $7,995 to $64,995 for varying levels of patent protection and invention-promotion services. The most expensive packages purport to include "global" patent protection, which will make their patents valid in the U.S. and abroad. The invention-promotion services offered also include: rendering drawings and 3D models of inventions; creating brochures, internet video commercials, press releases, and web sites about inventions; exhibiting consumers' inventions at trade shows and so-called "invention round tables"; and ongoing support from a personal licensing agent. Salespeople depict Defendants as offering a one-stop shop for patenting and invention-promotion, as well as licensing and manufacturing. Salespeople sometimes reference companies lining up to license or purchase consumers' inventions, and allude to Defendants' own purported manufacturing plants in China.

25.     Salespeople generally pressure consumers to act fast to protect their inventions and start making money from them. Salespeople assure consumers that they will not have to pay any more money to secure the benefits that Defendants are offering, including global patent protection.

26.     If consumers agree to purchase one of Defendants' packages, they sign a contract with Defendants and make a second, and purportedly final, payment to Defendants. In many cases, this contract also assures consumers that: "The inventor will not be held responsible for

any additional expenses incurred or assessed by World Patent Marketing, other than those defined within the scope of this agreement."

27. Contrary to Defendants' representations, virtually none of Defendants' customers has made money, or even recouped his or her investments, through Defendants' purported patenting and invention-promotion services. Defendants have not actually secured third-party licensing or manufacturing agreements for their customers, and their customers have not received income from patent royalties or sales of products as a result of Defendants' work on their behalf..

28. Also contrary to Defendants' representation, there is no such thing as a "global patent." A mechanism exists to apply for patents in multiple countries simultaneously under the Patent Cooperation Treaty, but an inventor still needs to pay fees to each country from which he or she expects to receive patent protection.

*Defendants' Post-Sale Conduct*

29. After consumers pay Defendants for their patenting and promotion packages, consumers are left to wait with little or no communication from Defendants. When consumers attempt to contact Defendants, they are often unable to reach the salespeople they have worked with or anyone in customer service who can help them.

30. Defendants sometimes provide certain inconsequential services in an attempt to string their customers along, thereby avoiding consumer complaints and credit card chargebacks. These low-effort, low-value services may include: registering an internet domain name for one year; designing drawings, logos, brochures, and banners; and issuing a press release on the internet.

31. Defendants fail, in almost every case, to provide many of the other promised invention-promotion services, such as promoting consumers' inventions at trade shows and other events, and providing ongoing support from a "licensing agent." Most importantly, Defendants fail to secure the promised third-party licensing and manufacturing agreements for consumers. In some cases, responding to consumers who insist that their inventions be manufactured,

Defendants tell consumers that consumers will need to pay tens of thousands, or even hundreds of thousands of dollars more to actually commence manufacturing.

32. Defendants also generally fail to procure patents for consumers. Though Defendants use offshore drafting services and contracted patent agents and attorneys to file patent applications, those applications are of poor quality, and are often not approved by the United States Patent and Trademark Office ("PTO") on its first review. Requests for more information or corrections from the PTO on Defendants' customers' patent applications often go unanswered by Defendants and their contractors, and eventually the PTO rejects the patent applications or considers the patent applications to have been abandoned.

33. In the end, after months or even years of stringing them along, Defendants leave most of their customers with nothing. A very few receive a patent, some receive an assortment of useless marketing materials; but none successfully enter into third-party licensing or manufacturing agreements brokered by Defendants, and none actually make money. Indeed, many of Defendants' customers end up in debt, or losing their life savings or inheritances, after investing in Defendants' broken promises.

*Defendants' Efforts to Suppress Consumer Complaints*

34. Defendants go to great lengths to hide their deceptive acts from potential customers, consumer groups, and law enforcement.

35. If consumers threaten to complain about Defendants' business practices, including by threatening to post complaints on the internet or complain to the Better Business Bureau or law enforcement, Defendants respond by threatening to file a lawsuit for extortion, defamation, and other causes of action. Defendants and their lawyers have threatened consumers with lawsuits and even criminal charges and imprisonment for making any kind of complaint about Defendants. For example, one consumer asked for a refund before any work was done on her invention and she mentioned filing a complaint with the BBB. Defendant Cooper's lawyer sent her a letter stating that her conduct was "illegal" and she was subject to fines or imprisonment, or both. Further he told her "you have proceeded far beyond what the law defines as free speech

8

and, instead, have engaged in an unlawful and intentional interruption of World Patent Marketing's business…World Patent Marketing hereby demands that you immediately cease and desist from making threats to defame it or illegally publish such statements to the Better Business Bureau." After months of trying to receive a refund or services, she filed a complaint with the BBB. Again she received a letter from a second lawyer who told her that her conduct of seeking a refund constitutes extortion under Florida law and, "since you used email to make your threats, you would be subject to a federal extortion charge, which carries a term of imprisonment of up to two years and potential criminal fines. See 18 U.S.C. ¶ 875(d)."

36. If consumers do complain to the BBB or law enforcement about Defendants' business practices, Defendants and their lawyers often make legal threats against the complainants until they retract their complaints.

37. Defendants have filed at least one lawsuit to suppress consumer complaints. After Defendants sued a consumer complaint website, a complaint against Defendants was removed from the site.

38. Defendants also cultivate a threatening atmosphere through e-mails to would-be complainants. For example, Defendants distributed, through an e-mail to all of Defendants' then-existing customers, a blog post discussing an incident that purportedly occurred in Defendants' offices: A consumer that allegedly wanted to speak with Defendant Cooper about an invention idea was stopped, detained, and expelled by Defendants' "intimidating security team, all ex-Israeli Special Ops and trained in *Krav Maga*, one of the most deadly of the martial arts." The post continued: "The World Patent Marketing Security Team are the kind of guys who are trained to knockout first and ask questions later." In another blog post Defendants distributed through an e-mail to all of their customers, Defendants boasted about their role in having a former employee arrested on extortion charges.

39. Since at least September 2016, Defendants have also included a "Confidentiality and Nondisparagement" clause in their contracts with consumers. It states, in part:

> The Client and WPM shall refrain from making or causing to be made, publishing, ratifying or endorsing any and all disparaging, negative, or other similar statements concerning either of them to any third party, including but not limited to individuals, entities, internet websites, blogs, publications, postings, emails, and any social media, such as Facebook, Twitter, blogs and wikis.

40. These tactics, including threats, intimidation, and gag clauses, discourage purchasers from speaking or publishing truthful or non-defamatory negative comments or reviews about the Defendants, their services, or their employees. By depriving prospective purchasers of this truthful, negative information, Defendants' practices have resulted or are likely to result in consumers buying services from Defendants they would not otherwise have bought.

## VIOLATIONS OF THE FTC ACT

41. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

42. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

43. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## Count I
## Deception

44. As described in paragraphs 12 to 33 of this Complaint, in numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of research, patenting, and invention-promotion services, Defendants have represented, directly or indirectly, expressly or by implication, that:

   a) Purchase of Defendants' invention-promotion services is likely to result in financial gain for their customers;

   b) Defendants have successfully marketed the invention ideas of many of their customers, resulting in royalties or sales of their inventions;

   c) Defendants successfully marketed specific invention ideas, such as Teddie's Ballie Bumpers, Live Expert Chat, and Supreme Diva Jeans;

   d) Consumers who buy one of Defendants' "global" packages will receive a globally-applicable patent;

   e) Defendants have regularly negotiated licensing and manufacturing agreements that have resulted in the manufacture and sale of their customers' inventions; and

   f) Consumers who buy Defendants' invention-promotion services will not have to pay any more money to receive Defendants' promised services.

45. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in paragraph 44 of this Complaint:

   a) Virtually all of Defendants' customers have lost their entire investment;

   b) Virtually none of Defendants' customers earned royalties or sales of their inventions;

   c) Defendants did not successfully market Teddie's Ballie Bumpers, Live Expert Chat, and Supreme Diva Jeans;

    d)    There is no such thing as a global patent as Defendants describe it to consumers;

    e)    Defendants have not regularly negotiated licensing or manufacturing agreements that have resulted in the manufacture and sale of their customers' inventions; and

    f)    Consumers routinely discover—when solicited for additional payments by Defendants themselves, third-party patent agents, or international patent offices—that they will need to pay significantly more money to receive Defendants' promised services.

46. Therefore, Defendants' representations as set forth in paragraph 44 of this Complaint are false, misleading, or were not substantiated at the time they were made, and thus, they constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II
## Unfairness

47. As described in paragraphs 34 to 40 of this Complaint, in numerous instances, Defendants have used tactics including threats, intimidation, and non-disparagement clauses to discourage purchasers from speaking or publishing truthful or non-defamatory negative comments or reviews about the Defendants and their services.

48. Defendants' practices as described in paragraph 47 of this Complaint have caused or are likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and that is not outweighed by countervailing benefits to consumers or competition.

49. Therefore, Defendants' practices as described in paragraph 47 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## CONSUMER INJURY

50. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

51. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Sections 13(b) of the FTC Act, 15 U.S.C. §§ 53(b), and the Court's own equitable powers, requests that the Court:

A. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;

B. Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

C. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

David C. Shonka
Acting General Counsel

Dated: March 6, 2016

Colleen Robbins, Special Bar # A5500793
James Evans, Special Bar # A5502080
Jody Goodman, Special Bar # A5502288
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-2548; crobbins@ftc.gov
(202) 326-2026; james.evans@ftc.gov
(202) 326-3096; jgoodman1@ftc.gov

*Attorneys for Plaintiff*
*Federal Trade Commission*