### DECLARATION OF RYAN MASTI
**Pursuant to 28 U.S.C. § 1746**

I, Ryan Masti, have personal knowledge of the facts and matters set forth below. If called as a witness, I could and would testify as follows:

1.      My name is Ryan Masti. I am 24 years old and I am a farmer.

2.      I have ADHD and dyslexia.  I graduated college with a Bachelors in Social Work. It took me an extra year to graduate because of my disabilities.  I also spent one year in the Navy.

3.      I had an idea for a social networking website called "Socially Accepted" for people with disabilities.

4.      In approximately April 2015, I found a company called World Patent Marketing ("WPM") online.  My Dad checked online for me and only found good reviews.  I spoke with a man named Duncan Innes.  He told me that he had to get my idea approved by WPM's board and if they accept it, he will give me a call.

5.      Duncan told me that I had to pay for a Global Invention Royalty Analysis ("GIRA") and it cost $1295.  I paid the money through a wire transfer.

6.      Weeks later I received the GIRA and it said that I had received a score of 72% which was in the "probably successful" category.  Most of the report seemed like garbage, but Duncan told me that 72% was a good score and that it was equal to another invention they successfully sold in stores.  He told me that it was similar to the "shrinking garden hose" invention and that WPM sold that invention to a company and it is a huge success.  He encouraged me to go forward with WPM because my invention is equal to that prior successful invention.  Attached as **Attachment A** is a true and correct copy of the evaluation portion of the GIRA.

7.      After I received the GIRA, Duncan told me that I should pay $21,995.  He suggested getting a utility patent for $11,995 and the mobile app development for $9,997.  Then we got the package prices in the mail, and the cost was higher.  We were told it was because we would also get a trademark as part of the package.  He also told me that this would include

1

PX 36, 3377

marketing (including at trade shows), prototypes, licensing and manufacturing. I was told this is all the money I would have to pay. On April 21, 2015, I paid $23,487.50

8.      Instead of paying off my student loans from school, I took out a loan of $19,000 and paid the rest with money I had that was supposed to pay back my student loans.

9.      Then Duncan disappeared, and I had no information from WPM until approximately February 2016. A man named Jerry Shapiro from WPM contacted me and told me this invention is a great idea and WPM wants to do a public campaign about the invention, including a worldwide press release and building the app.

10.      Jerry told me that WPM would build the website that would lead to the app, but I would have to pay an additional $100,000 for both the website and app. He also told me that I would get 10% of the royalties. I told him no because I could not afford that and I thought I had already paid for everything, and Jerry told me to come back with a counter offer. I came back with an offer of paying $50,000 (on top of the payment I already made of $23,487.50) and receiving 30% of the royalties.

11.      At this point, I had to involve my Dad since I wanted his help in negotiating with WPM. I wanted to make sure that I was not being taken advantage of. Jerry told me and my Dad that worse case scenario I could make a million in sales minimum. He also said that less than 5% of inventors make it to the stage where WPM will prototype and manufacture a product, but what company would not want to help people with disabilities. Jerry also said that Scott will put money into this invention so that it can get built. Jerry told me that Scott would put in $500,000 to build this invention, so the $50,000 we were going to put in was nothing in comparison.

12.      Based on these representations, my Dad and I agreed and my Dad took $50,000 out of his 401K and gave it to WPM to build the invention.

13.      On February 23, 2016, I signed a licensing agreement with WPM Licensing Partners, Inc. for a licensing deal with WPM for my invention. Attached as **Attachment B** is a true and correct copy of the agreement.

**PX 36, 3378**

14.     On March 1, 2016, WPM put out a press release about the licensing deal that we entered into. Attached as **Attachment C** is a true and correct copy of the press release.

15.     In approximately April 2016, WPM told me they would build the invention as an app and market it through the Itunes Store and GooglePlay. At that time Jerry told me it would be built in six months.

16.     During my time working with WPM, I would send emails constantly, but rarely would I ever receive emails back. I would only receive emails saying that WPM is working on my project. If I received an email it was almost always in response to my email.

17.     I spoke with a woman named Cattya Bella at WPM and she told me WPM would promote my invention worldwide. I did receive a logo and a press release, but that is the only marketing WPM did that I know of.

18.     Over the past year, I repeatedly asked about the development of my app and I was constantly told that they were working on it.

19.     In June 2016, Jerry told me that the app would be developed within 6 months from our contract date in March 2016. In July 2016, Jerry told me that we were still on schedule. Attached as **Attachment D** is a true and correct copy of the email string.

20.     In October 2016, there was no product launch of my app as Jerry told me there would be. The website and the app were supposed to be launched at the same time.

21.     In October 2016, I got a call from Jerry who told me that WPM was getting ready for the launch.

22.     On October 26, 2016, I got an email from Scott who told me to look at the "splash page" for https://getsocial.life.com. A splash page is an initial web site page used to capture people's attention as a lead-in for a web site. He also told me that he wanted his foundation to be involved with the product launch. He asked me to call him.

23.     I did speak with him. We had a lengthy conversation. He told me that he is worth $20 million and he made all of his money in mortgages. When we were discussing launching the app, he asked me if I was fat or ugly because he told me he did not want me to be the face of my

3

invention if I was fat or ugly. At the end of the call, he told me that I owed him money. He was very aggressive on the call. I told him that I gave him all the money I had and I have nothing left to give. I asked him if I need to get a lawyer because I was told I would not have to pay any more money. He then told me that it was not worth losing sleep over, we will figure something out. He also told me that Ms. Rhode Island was supposed to endorse my product. He made some very unprofessional and rude comments about Ms. Rhode Island's appearance.

24.     On December 13, 2016, I received an email from Jerry Shapiro who told me that they are making last minute updates to the app to make sure that it is 100% functional before submitting to Apple. He also told me that "it has been confirmed that complete launch will take place within the next (3-7) business days. Complete launch means the app is readily available and downloadable on the Apple store." Attached as **Attachment E** is a true and correct copy of the email. I was very excited and told a lot of my friends who have disabilities that the product was going to be launched soon.

25.     In response to my emails about my product, I would get emails that WPM is about to launch my invention, but it never happened. I always responded in a professional manner.

26.     On December 21, 2016, I received an email that WPM is "working with Apple right now."

27.     A search online showed me that it takes no more than 6 days for Apple to approve an app submitted via the IOS store. It appears that the normal process is to build the app first, submit it to Apple under the developer's credentials and then Apple approves or denies it within 6 days. If WPM submitted my app on December 21, 2016, then it should have been approved or denied by now.

28.     I emailed WPM on January 12, 2016 and was told that they had not heard anything from Apple. I was also told that WPM was meeting with the developers about the website on the following Monday, but they had already told me that the splash page was live in October 2016.

4

29.     On January 17, 2016, Jerry Shapiro told me again that the developers are still working with Apple and sent me a status box from Apple purportedly showing me that Apple is working on it. Attached as **Attachment F** is a true and correct copy of the email.

30.     On January 25, 2017, Jerry told me that the developers had to update the app and are still working with Apple.

31.     Jerry told me that the estimated launch was between January 28 and February 1, 2017, but nothing happened and the app was never launched.

32.     Up until March 1, 2017 I kept receiving emails that said the developers are working on it and WPM is working with Apple.  The emails always said Scott and our team are ready to launch the app.

33.     On March 2, 2017, I received an email from Jerry that he was meeting with Alexander Napoles, the developer in Israel, about the Apple launch.

34.     The splash page's URL is https://getsocial.life. My invention is called "Socially Accepted." WPM also put the company name down as the Inventor as well as the Cooper Idea Foundation.  I asked Scott about the name of the website and why they did not use my invention name, Socially Accepted.  Scott told me it would be a "pain in the ass" and I did not push it. I trusted him.

35.     The splash page looks terrible. It looks like someone created it in an hour.  Also, the splash page creates the impression that the app is already built and as far as I know, it is not. Attached as **Attachment G** is a true and correct copy of the website.  One of the photos on the splash page seems identical to a photo on the Special Olympics' website.

36.     Jerry informed me that I was patent pending, but I have not heard anything and do not know the status of my patent.

37.     For the $75,000 I paid to WPM, I received a press release, logo, and a low-budget

PX 36, 3381

splash page that does not have my name anywhere on it, and it says it was developed and created by World Patent Marketing.  I have no knowledge about the status of my app or my patent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 03/ 29            , 2017
Cameron, NY
                                                 Ryan Masti

PX 36, 3382

INNOVATION EVALUATION

SOCIALLY ACCEPTED

RYAN MASTI

Our initial evaluation of your innovation has been completed. Thirty-two (32) areas of concern for new product introduction are grouped into five (5) major factors. The completion phrase(s) given for each of the thirty-two (32) areas of concern correspond to the judgment of several evaluators. Their responses have been averaged by the computer and the appropriate completion phrase(s) to each area of concern is printed below. If two phrases are printed for an area of concern, then the score for your innovation falls between the two possible completion phrases. The preliminary evaluation should provide you with some indication of the marketability and probable success of your innovation.

1. **PROTECTION CRITERION: Considering patents (or copyrights), technical difficulty, and secrecy, the prospects for protection appear to be:**

Legal Protection and/or secrecy possible

2. **NEW COMPETITION CRITERION: Competition from new entrants or competitive action is expected to be:**

Low - product lead will be relatively long

3. **EXISTING COMPETITION CRITERION: Existing competition for this innovation appears to be:**

Low - a significant market share can be gained

4. **PRICE CRITERION: Relative to competition and/or substitute products, the selling price is likely to be:**

Lower - a competitive advantage

5. **DURABILITY CRITERION: Relative to competition and/or substitutes, durability of the product is likely to be perceived as:**

Similar - noticeably better

6. **FUNCTION CRITERION: Relative to competing and/or substitute products, services, and processes, the function performed might be perceived as:**

Superior - a noticeable improvement

7. **APPEARANCE CRITERION: Relative to competition and/or substitutes, appearance is likely to be perceived as:**

Attachment A

**PX 36, 3383**

**8. SERVICE CRITERION:** The cost and difficulty associated with providing product service is likely to be:

Very low -will require little or no parts and service

**9. DISTRIBUTION CRITERION:** The cost and difficulty of establishing distribution channels are likely to be:

Low relative to expected sales

**10. PROMOTION CRITERION:** The costs and effort required to promote the advantages and benefits are likely to be:

Low relative to expected sale

**11. VISIBILITY CRITERION:** The advantages and benefits are:

Visible – easily communicated

**12. DEPENDENCE CRITERION:** The degree to which the sale or use of this product is dependent upon other products, processes, or systems is:

Low – strong market control

**13. NEED CRITERION:** The level of need filled or utility provided by this innovation is:

Moderate – fulfills both psychological and physical non-essential needs

**14. LEARNING CRITERION:** The amount of learning required for correct use is:

Very low – no instructions needed

**15. PRODUCT LINE POTENTIAL CRITERION:** The potential for additional products, multiple styles, qualities, price ranges, etc., is:

Moderate – multiple markets/use potential

**16. CYCLE CRITERION:** The product life cycle is likely to be:

Five to seven years

**17. STABILITY OF DEMAND CRITERION:** The fluctuation in demand is likely to be:

Predictable

Attachment A

PX 36, 3384

**18. TREND OF DEMAND CRITERION:** The market demand for products of this type appears to be:

Growing slowly

**19. POTENTIAL SALES CRITERION:** Expected sales of this product might be:

Large ≈ within too large

**20. POTENTIAL MARKET CRITERION:** The total market for products of this type may be:

LARGE – INTERNATIONAL

**21. RESEARCH AND DEVELOPMENT CRITERION:** The research and development required to reach the production-ready stage will be...

Relatively easy and simple

**22. MARKETING RESEARCH CRITERION:** The marketing research required to develop market-ready product is estimated to be:

Relatively easy and simple

**23. PROFITABILITY CRITERION:** Profitability is defined as the extent to which anticipated revenues will cover the relevant costs for a manufacturer or licensee (direct, indirect, and capital). Anticipated revenues: \*\*\* THIS DOES NOT REFER TO THE INVENTOR \*\*\*

Will cover direct and indirect costs and easily exceed capital cost (ROI)

**24. PAYBACK PERIOD CRITERION:** The expected payback period (time required to recover initial investment) for a manufacturer or licensee is likely to be... \*\*\* THIS DOES NOT REFER TO THE INVENTOR \*\*\*

LESS THAN 6 MONTHS

**25. INVESTMENT COSTS CRITERION:** The manufacturer or licensee's amount of capital and other costs necessary for development to the market-ready stage would be... \*\*\* THIS DOES NOT REFER TO THE INVENTOR \*\*\*

Low – recoverable within two years

**26. STAGE OF DEVELOPMENT CRITERION:** Based on available information, there is...

A rough prototype and/or drawings and sketches

Attachment A

PX 36, 3385

required for production, this invention will...

Have some problems which can be overcome

**28. FUNCTIONAL FEASIBILITY CRITERION: In terms of intended functions, will it actually do what it is intended to do?**

It will work, some changes might be needed

**29. LEGALITY CRITERION: In terms of applicable laws (particularly product liability), regulations, product standards, this idea/invention/new product:**

Meet them without any changes

**30. SAFETY CRITERION: Considering potential hazards and side effects, the use will be:**

Very safe under all conditions, including misuse

**31. ENVIRONMENTAL IMPACT CRITERION: In terms of pollution, litter, misuse of natural resources, etc., use might...**

Have no effect on the environment

**32. SOCIETAL IMPACT CRITERION: In terms of the impact (benefit) upon the general welfare of society, use might...**

Have a positive benefit to society

INNOVATION EVALUATION

*Likelihood Question: Likelihood estimate shown is in our opinion, the likelihood of this idea, process or product being successful in the marketplace. (see chart below)*

| | |
|---|---|
| Definitely Not Successful (0 - 19) | |
| Probably Not Successful (20 - 39) | |
| May be Successful (40 - 59) | |
| Probably Successful (60 - 79) | 72 |
| Definitely Successful (80 - 100) | |

NOTE: This estimate should be interpreted as an overall summary, based on the 32 criteria of the likelihood of chance of success for your invention or new product idea. If this information seems to contradict some of the written responses for the criteria, it is because the estimate reflects the varying degrees of importance and the interrelationships of the 32 criteria. Consequently, you should place greater emphasis on this information than any specific criterion contained in your evaluation report.

Attachment A

### Global Engineering, Manufacturing & Distribution Agreement Offer

This Patent License Agreement (the "Agreement") is made and entered into as of the 23rd day of February, 2016 (the "Effective Date"), by and between Socially Accepted LLC, a Cameron NY LLC with a mailing address of 4848 county road 10 Cameron NY 14819 ("Owner" or "Licensor") and WPM Licensing Partners, Inc., a Florida corporation with a mailing address of 1680 Meridian Avenue, Suite 600, Miami Beach, FL 33139 ("WPM" or "Licensee").

This Global Engineering, Manufacturing & Distribution Agreement Offer expires on: Wednesday, February 24th 2016

### RECITALS:

A.      Owner hereby warrants and represents that is the owner of the patent or pending patent application filed with the United States Patent and Trademark Office ("USPTO") under the registration #TBD also known as **Socially Accepted** (each, a "Licensed Patent" and collectively, the "Licensed Patents") and/or that Owner has the lawful right to grant WPM a license to use the Licensed Patents as used and patented with a variety of goods, including but not limited to, the "Licensed Goods" (as defined below); and

B.      WHEREAS Patent Owner represents and warrants that it has not encumbered or otherwise granted any third party an interest in the Licensed Patents or Licensed Goods, and

C.      WHEREAS Patent Owner, as the sole owner of the entire right, title and interest in and to all intellectual property rights in the Licensed Patents, wishes to have the Licensed Goods manufactured by a third party, and

D.      WHEREAS WPM desires to manufacture, promote and/or market goods that are similar in construction and appearance to the product described in the abovementioned patent registration.

E.      WHEREAS WPM has requested an exclusive license to manufacture, distribute and sell the Licensed Goods and Owner is willing to grant such a license to WPM on the terms set forth herein; and

F.      Owner desires to grant a license to WPM for WPM to use the Licensed Patents on and in connection with the Licensed Goods in the "Territory" (as defined below) subject to the terms and conditions set forth in this Agreement; and

G.      Subject to the terms and conditions set forth herein, WPM desires to obtain said license from Owner to use the Licensed Patents in connection with the manufacturing, marketing, promotion, sale and distribution of the Licensed Goods within the Territory.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, Licensor and WPM hereby agree as follows:

Attachment B

**PX 36, 3387**

1.    <u>Definitions</u>. As used herein, the terms set forth shall be defined as follows:

1.1    "Affiliate" shall mean any person or entity directly or indirectly controlling or having the power to control, or controlled by or being under common control with another person or entity. For this purpose, "control" means the direct or indirect possession of power to direct or cause the direction of the management or policies of such party, whether through ownership or stock or other securities, by contract or otherwise. Ownership of more than fifty percent (50%) of the beneficial interest of an entity shall be conclusive evidence that control exists.

1.2    "<u>Licensed Goods</u>" shall mean the products that WPM is authorized to manufacture, sell, promote, market or distribute bearing a licensed patent pursuant to the license granted herein.

1.3    "<u>Territory</u>" shall mean the entire world. For avoidance of doubt, all countries and territories located in world comprise the Territory.

1.4    "<u>Net Sales</u>" shall mean the invoiced amount of Licensed Goods sold by WPM or any of its affiliates, less manufacturing costs, marketing costs and documented returns of Licensed Goods. Commissions, freight and other costs incurred in manufacturing, promoting, distributing or selling the Licensed Goods shall be deductible from gross sales in calculating Net Sales.

2.    <u>Grant of License</u> Owner hereby grants WPM an exclusive, non-transferable and non-revocable worldwide right and license to use the Licensed Patents in connection with the manufacture, use, advertising, promotion, marketing, distribution and sale of the Licensed Goods in accordance with the terms of this Agreement. WPM may also grant any sublicense, security interest or any other interest or right with respect to the Licensed Patents or any "Product Attributes" (as defined below) to any manufacturer or distributor without any further prior written approval of Owner. The parties agree that any variations of or modifications to the Licensed Goods developed by either WPM or Patent Owner shall be included within the definition of Licensed Goods and shall be governed by this Agreement. This license shall continue in full force and effect for a period of twenty-five (25) years after the Effective Date.

2.1    <u>Scope of Use</u>. WPM is granted the exclusive right to use the Licensed Patents in connection with the manufacture, promotion, marketing, sale and distribution of the Licensed Goods globally during the Term. This license is granted to allow WPM to utilize any of the Licensed Patents or any Product Attributes in any manner whatsoever. Any Licensed Goods may be produced, marketed, or sold by WPM bearing the Licensed Patents without any additional approval of Owner. Owner or its affiliates are prohibited from manufacturing or having manufactured Licensed Goods or any other products bearing the Licensed Patents during the term of this Agreement. Owner shall have no right to sell Licensed Goods and other products

bearing the Licensed Patents to anyone and/or otherwise use the Licensed Patents during the term of this Agreement.

2.2     Retail Sales; Internet Sales.  The rights granted to WPM hereunder shall include the right to sell Licensed Goods at retail stores, on a wholesale basis and/or via websites regardless of whether such websites are owned or operated by WPM or any of its Affiliates including, but not limited to, sales through the Internet.  The Royalties payable on such sales shall be based on Net Sales at the full retail price collected from the end consumer purchasing Licensed Goods via said sites or stores.

2.3     Manner of Making Payments.  All payments required of WPM hereunder shall be made to Owner in U.S. Dollars via wire transfers, or in such other manner as Owner shall designate, as follows;

        If paying by check:

        _____

        If paying by wire:

        _____

2.4     Taxes.  WPM shall be responsible for payment of all taxes, duties and any other governmental charges payable by WPM and/or in connection with the production, marketing, distribution and sale of the Licensed Goods.

2.5     Covenant to Exploit the Licensed Rights.  WPM shall use its commercially reasonable efforts to exploit the rights herein granted throughout the Territory and to sell the maximum quantity of Licensed Goods therein.

2.6     Term.  This Agreement will commence on the Effective Date hereof, and will continue in effect for the period set forth in paragraph 1.5.

2.7     Post Expiration Sell-Off.  In the event this Agreement is not renewed, WPM may continue to sell its inventory of Licensed Goods in existence as of the date of expiration until such time as such inventory is sold in its entirety.  Owner shall have the right at any time to purchase all of WPM's then remaining inventory of Licensed Goods on the terms provided herein.

2.8     Reversion of All Rights to Owner Upon Expiration.  Except for the sale of inventory during the sell-off period, if any, on expiration, all of the rights of WPM under this Agreement shall terminate forthwith and shall revert immediately to Owner and WPM immediately shall cease the manufacture, distribution and sale of Licensed Goods, discontinue all use of the Licensed Patents and transfer and assign in writing to Owner, free of charge, all registrations, filings and rights with regard to the Licensed Patents or any intellectual property rights relating to the Licensed Goods or Product Attributes that it may have possessed at any time.

Attachment B

PX 36, 3389

1.     <u>Licensed Goods.</u>

3.1     <u>Brand Identity Guidelines and Product Attributes</u>.   WPM shall determine materials, designs, colors, labels and packaging (collectively, the "<u>Product Attributes</u>") that WPM desires for use in connection with Licensed Goods.   WPM shall formulate the Product Attributes in consultation with Owner.    Owner shall provide WPM with stylistic and technical assistance for the creation of the Licensed Goods, i.e., Owner may provide WPM with style specifications featuring original sketches, drawings and/or models. WPM shall also create the prototypes of all models of Licensed Goods to marketable standards.

3.2     <u>Ownership and Use of Product Attributes</u>.    All designs, sketches and other materials forming part of the Product Attributes provided by Owner shall be used by WPM in connection with the manufacture, distribution and sale of Licensed Goods, and the advertising, marketing and promotion of Licensed Goods in the Territory and pursuant to this Agreement. Whether or not WPM chooses to use any such designs, sketches or other materials, Owner may not use and permit others to use them in any manner.

3.3     <u>Originality of Product Attributes</u>.   WPM shall not copy or base any of the Product Attributes for the Licensed Goods on any identifiable designs used in the development of any other products (whether "private label" or "branded") and agrees that such other products shall be sufficiently differentiated from the Licensed Goods produced under this Agreement. WPM shall also not develop any products for anyone other than Owner using any of the Product Attributes.   Rework this to a limited term

3.4     <u>Licensed Goods Samples</u>.   WPM shall be responsible for making all samples of Licensed Goods and WPM shall advance all costs in connection therewith.   WPM further agrees to provide Owner with reasonable quantities of samples of all Licensed Goods free of charge as may be requested by Owner from time to time.   WPM shall, at its own expense, provide to Owner or its designee, such samples (including prototype samples and/or complete sets of current Licensed Production samples) of the Licensed Goods and presentation and promotional materials as Owner may, from time to time, request for quality control testing, comparison with earlier samples, proof of Licensed Patents use and/or for use and display in showrooms or at exhibitions worldwide.

3.5     <u>Requirements with Respect to Licensed Goods</u>.   The styles, designs, packaging, contents, workmanship and quality of all Licensed Goods will be provided to Owner and approved by WPM prior to the offering for sale, sale or distribution thereof. Unless waived in writing by Owner in advance, before offering for sale, selling or distributing any Licensed Product, WPM shall deliver to Owner for its approval, free of charge, one (1) prototype sample of each such Licensed Good. Additionally, upon Owner's request, WPM shall submit to Owner, without charge, then current production samples of each Licensed Good produced hereunder so that Owner may assure itself of the maintenance of the quality standards set forth herein.

Attachment B

**PX 36, 3390**

3.6   <u>Compliance with Laws</u>.   All Licensed Goods shall be manufactured, and all Licensed Goods shall be offered for sale, sold, labeled, packaged, distributed and advertised, in compliance with all applicable treaties, laws and regulations, including all child and other labor laws and regulations, all customs requirements and country of origin regulations and all treaties, laws and regulations relating to health and safety, disclosure of information to the consumer and testing of products and materials.

3.7   <u>Use of Subcontractors</u>.   WPM may use contractors for the production of Licensed Goods.  WPM's engagement of contractors shall not limit WPM's obligations hereunder.

3.8   <u>Owner Approval/Disapproval of Customers/Points of Sale</u>.   In the event Licensed Goods retailers engage in unfair competition practices and/or misuse the Licensed Patents in any way and WPM decides to take legal action, Owner shall cooperate with WPM in every way, even if this means joining WPM in such legal action.

3.9   <u>Pricing and Terms of Sale of Licensed Goods</u>.   Nothing in this Agreement shall be deemed to imply any restriction on WPM's freedom and that of its customers to sell the Licensed Goods at such prices as WPM or, as the case may be, its customers shall determine.

3.10   <u>Licensed Product Order Fulfilment</u>.   WPM shall be solely responsible for the proper fulfilment of the orders placed by its customers.

## 4.   <u>Royalties.</u>

1.1   <u>Accrual.</u>   Royalties accrue thirty (30) days after the sale of a Licensed Good, and a Licensed Good is considered "sold" after it has shipped and been paid for.  Licensed Good sales to an affiliate of WPM shall be deemed to have been made at WPM's average billing prices for sales of the same Licensed Goods to non-affiliated entities.

1.2   <u>Royalty Program</u>.

1.   In exchange for payment of $100,000 from Owner to WPM, WPM shall pay to Owner a "Royalty" or "Royalties" equal to 30% of "Net Sales", during each three (3)-month period while this Agreement is in effect.

2.   Initial payment of $50,000 due from Owner to WPM by 3/08/16

4.3   <u>Correctness of Statements and Payments</u>.   The receipt or acceptance by Owner of any statements furnished pursuant to this license or any Royalties paid hereunder (or the cashing of any Royalty checks paid hereunder) shall be deemed a waiver of any rights of Owner to audit the accuracy of WPM's records.  In the event of an overpayment by WPM, WPM may deduct such mutually verified overpayment from any payment due with the next quarterly payment.  In the event no further Royalty statements would be forthcoming after discovery and mutual verification of the overpayment, then WPM shall receive a refund of such overpayment within thirty (30) days after its written request for a refund to Owner.

5

Attachment B

**PX 36, 3391**

4.4   Record Keeping.  WPM shall keep accurate books of account and records covering all financial detail relating to this Agreement and the computation of Royalties, and shall keep the same available for at least one (1) year after expiration of this Agreement.

4.5   Quality Assurance.  The Licensed Goods shall be new products, free from defects in design, workmanship and materials, and of a standard of quality similar to the quality of like-priced products in the marketplace and to the protection of the Licensed Patents and goodwill associated therewith and symbolized thereby.  The Licensed Goods shall be manufactured in accordance with WPM's manufacturing specifications, protocol, safety, and quality control standards ("Manufacturing/Product Specifications").

4.6   Disclaimer of Warranties.   EXCEPT AS EXPRESSLY WARRANTED IN THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WPM HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, STATUTORY AND IMPLIED, APPLICABLE TO THE LICENSED GOODS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR THAT ANY PRODUCT IS DELIVERED FREE OF CLAIMS OF THIRD PARTIES BY WAY OF INFRINGEMENT OR THE LIKE.

1.   Other Covenants of WPM.  WPM makes the following additional covenants:

1.1   "Creation and Distribution of Licensed Goods."   WPM is responsible for advancing all expenses associated with the manufacturing, marketing, and distribution of the Licensed Goods, including but not limited to designing, manufacturing, purchasing, distributing, transactional fees, and in-store if any.  Such expenses shall be deducted from Net Sales as defined in section 1.4 above.

5.2   Use as Corporate Name, Trade Name or Domain Name.  WPM may use or register any of the Licensed Patents, in whole or in part, as a corporate name, trade name or domain name and may use any of the Licensed Patents in combination with any other mark, design or designation.

5.3   Acknowledgement of Joint Ownership. WPM acknowledges that, as between WPM and Owner, Owner is the owner of all right, title and interest in and to the Licensed Patents in any form or embodiment thereof and is also the owner of the goodwill associated therewith and symbolized thereby now and in the future, including all goodwill that shall become associated with and symbolized by the Licensed Patents in connection with the Licensed Goods and the business and goods in relation to which the same has been, is or shall be used.  Sales by WPM shall be deemed to have been made by Owner for purposes of patent registration.

5.4   Further Assurances and Assistance.   WPM shall execute any documents reasonably required by Owner to confirm Licenser's ownership of all rights in and to the Licensed Patents.   WPM shall cooperate with Owner in connection with the filing and prosecution by Owner of applications in Owner's name to register the Licensed Patents and the maintenance and renewal of such registrations as may issue as agreed by the parties.

Attachment B

PX 36, 3392

    5.5    <u>Legal Notices and Markings</u>.  WPM shall use the Licensed Patents strictly in compliance with all applicable legal requirements.  WPM shall cause to appear on all Licensed Goods and on all materials on or in connection with which the Licensed Patents are used, such legends, markings and notices as may be reasonably necessary in order to give appropriate notice of any Patent, trade name, copyright or other rights therein or pertaining thereto. WPM may affix to the Licensed Goods or any related presentation and promotional materials any logos, Patents, or indications indicating the composition of the Licensed Product materials or fibres, instructions for maintenance/care or those required under applicable law and regulations.

    5.6    <u>Limitations</u>. WPM shall not be liable to Owner on account of any losses, liability, damages or expenses (including attorneys' fees and expenses) that either party may incur or be obligated to pay, or for which it may become liable or be compelled to pay in any action, claim or proceeding against it, by reason of the fact that the use of the Licensed Patents or the Product Attributes or the sale of the Licensed Goods anywhere infringes upon any rights of a third party.

5.7    <u>Intellectual Property Rights With Respect to Licensed Goods and Product Attributes</u>.  Any intellectual property right that may be created in any Licensed Goods, Product Attributes or any sketch, design, packaging, label, tag or other work product designed or provided by Owner shall be, as between Owner and WPM, the property of Owner.  Neither WPM nor any of its affiliates shall, at any time, do or suffer to be done any act or thing which may adversely affect any rights of Owner in any of same, including filing any application in its name to record any claims to copyrights in Licensed Goods, Product Attributes or other such materials, and shall do all things reasonably required by Owner to preserve and protect said rights, including placing appropriate Patent registration notices on all Licensed Goods and the packaging, labels and tags therefore.  If WPM is deemed by operation of applicable law to own any rights in and to any of the intellectual property with respect to the Licensed Goods, Product Attributes or other such materials, WPM hereby conveys, grants, transfers and assigns to Owner, all of such rights, including rights to copyright (including the right to adapt or create derivative works and the right to exploit such derivative works), designs and other intellectual property rights, title and interest in and to same, on an exclusive, perpetual, irrevocable, worldwide and royalty-free basis. If WPM (including but not limited to, its Subcontractors or employees) is deemed under applicable law to retain any inalienable rights, including, without limitation, moral rights in and to Owner's Property or any derivative works based thereon, WPM hereby agrees to waive the exercise of such rights. WPM shall execute any assignments, certificates of originality and other documents reasonably required by Owner to confirm Licenser's ownership of all rights in and to the Product Attributes and any other intellectual property rights with respect to the Licensed Goods, Product Attributes or other such materials.  WPM shall cooperate with Owner in connection with the filing and prosecution by Owner of applications in Owner's name to register the Product Attributes and/or Licensed Goods in the Territory and the maintenance and renewal of such registrations as may issue and shall police and cooperate with Owner with respect to infringements thereof and shall, with respect to the Product Attributes and Licensed Goods, otherwise comply with the other requirements set forth in this Agreement for the Licensed Patents.

    2.    <u>Indemnification</u>.

PX 36, 3393

6.1    Owner.  Owner hereby indemnifies, defends and holds and shall indemnify, defend and hold WPM against any and all losses, liability, damages and expenses (including reasonable attorneys' fees and expenses) that WPM may incur or be obligated to pay, or for which WPM may become liable or be compelled to pay in any action, claim or proceeding against WPM, by reason of the fact that WPM's use of the Licensed Patent strictly in accordance with the terms of this Agreement infringes upon the rights of a third party.  In the event any claim is made against WPM which gives rise to the indemnification provided for herein, Owner's liability to WPM shall not be limited to the amount of any actual damages incurred by WPM under this Agreement and may include any consequential, special, punitive or similar damages.

6.2    Procedures for Indemnification.  Any person seeking indemnification hereunder (the "Indemnitee") shall use reasonable efforts to give WPM or Owner, as the case may be (for purposes of this section (the "Indemnitor"), notice of any action, claim or proceeding for which indemnification is being sought promptly after the Indemnitee becomes aware of such action, claim or proceeding; provided, however, that the failure of the Indemnitee to provide the Indemnitor prompt notice of any such action, claim or proceeding shall not adversely affect the Indemnitee's rights under this Agreement unless, and then only to the extent, that the Indemnitor is materially prejudiced by such failure.  Upon receiving notice of any action, claim or proceeding for which an Indemnitee is seeking indemnification, the Indemnitor, in its sole but reasonable discretion, shall take such action as it deems advisable to defend such action, claim or proceeding on behalf of the Indemnitee.  In the event appropriate action is not taken by the Indemnitor within twenty (20) days after its receipt of notice from the Indemnitee, the Indemnitee shall have the right to defend such action, claim or proceeding, in which case the Indemnitor also shall reimburse the Indemnitee for its costs in defending such action, claim or proceeding, but no settlement thereof may be made without the approval of the Indemnitor, which approval shall not be withheld or delayed unreasonably.  Even if such appropriate action is taken by the Indemnitor, the Indemnitee may, at its own expense, be represented by its own counsel in such action, claim or proceeding.  In any case, the Indemnitee and the Indemnitor shall keep each other fully advised of all developments and shall cooperate fully with each other in all respects in connection with any such defense as is made.

7.    **Confidentiality.**  WPM and Owner acknowledge that all information relating to the business and operations of Owner and WPM and their affiliates that they learn or have learned during or prior to the term of this Agreement, all creative concepts that the parties provide to each other hereunder are the valuable property of the providing party.  The parties acknowledge the need to preserve the confidentiality and secrecy of the foregoing and agree that, both during and after the term of this Agreement, they shall not use or disclose same, except for such use that is permitted under this Agreement. The parties shall further take all necessary steps to ensure that use by it or by its contractors and suppliers shall preserve in all respects such confidentiality and secrecy.  The terms of this Agreement shall not be disclosed to any third party without the prior written approval of the other party.

1.    **Owner's Use of Licensed Goods.**

Attachment B

**PX 36, 3394**

1.1   <u>WPM's Reasonable Assistance to Owner/Litigation</u>.  WPM agrees to reasonably assist Owner in protecting their rights to the Licensed Patents and Product Attributes, including (but not limited to) reporting to Owner any possible infringement or imitation of the Licensed Patents or Product Attributes it becomes aware of.  WPM shall have the sole right to determine whether to institute litigation with respect to such infringements, as well as the sole right to select counsel.  Owner may, however, commence or prosecute any claims or suits for infringement of the Licensed Patents or Product Attributes in their own name or the name of WPM or join WPM as a party thereto at Owner's sole cost and expense.  If Owner brings an action against any infringer of the Licensed Patents or Product Attributes, WPM shall cooperate with Owner, lend whatever assistance is necessary, subject to being reimbursed for its out-of-pocket expenses and attorneys' fees.

2.   <u>Disclaimer of Partnership or Agency</u>.  Furthermore, the parties agree and understand that the relationship between WPM and Owner under this Agreement is wholly that of independent contractors.  WPM is in no way the legal or other representative, partner, joint venturer, affiliate, employee or agent of Owner for any purpose and shall have no power to assume or create, in writing or otherwise, any obligation or responsibility of any kind, express or implied, in the name of or on behalf of Owner.  It is expressly recognized that no fiduciary relationship exists between or among the parties.

3.   <u>Notices, Payments and Approvals</u>.  All notices and statements to be given shall be sent in writing and shall be deemed to have been duly given when delivered if sent by an internationally recognized overnight carrier to the addressed stated in the opening of this Agreement, unless notice is sent as required herein as to a different address in which to send noticed effective after the date of receipt of any such notice.  Any payments made by either party pursuant to this agreement, including, but not limited to, any partial payments, deemed earned and non-refundable.

4.   <u>Modification</u>.  This license may be changed only in writing and signed by both parties.

5.   <u>Waiver</u>.  Any party's failure to enforce, or delay in enforcing, any of its rights under this Agreement shall not be deemed a waiver of any of those rights or any other rights under this Agreement.

6.   <u>Entire Agreement</u>.  This Agreement and all schedules and exhibits mentioned herein or attached hereto are hereby incorporated herein by reference and set forth the entire Agreement between the parties and supersedes all prior agreements, representations, oral statements, and understandings.  None of the terms of this Agreement may be waived or modified except as expressly agreed to in writing by the parties.

7.   <u>Authorization</u>.  Those signing are authorized to bind Owner and WPM, respectively, to the terms of this License.

Attachment B

**PX 36, 3395**

15.   __Governing Law.__   This Agreement shall be interpreted and construed in accordance with, governed by, and enforced in accordance with the laws of the State of Florida without regard to principles of conflicts of law.  Any legal action resulting from this Agreement shall only be brought in Miami-Dade County, Florida, in any court having jurisdiction thereof, except that Owner also may bring an injunctive proceeding in any jurisdiction where appropriate by reason of the subject matter of such action.  Each of Owner and WPM hereby irrevocably submits to the jurisdiction of any of said courts located in Miami-Dade County, Florida and hereby waives any claim or defense of inconvenient forum or lack of personal jurisdiction under any applicable law, decision or treaty or otherwise.

16.   __Assignability.__   The performance of Owner hereunder is of a personal nature and, therefore, neither this Agreement nor any of the rights granted to WPM hereunder may be assigned, sublicensed (except as otherwise provided for above) or transferred by Owner and any such attempted assignment, sublicense or transfer, whether voluntary or by operation of law, shall be void and of no force or effect and shall constitute an uncurable default hereunder. WPM may freely assign or encumber this Agreement without any consent being required from Owner. Exception for merger and in any other event not to be unreasonably withheld.

17.   __Binding Effect.__  This Agreement shall inure to the benefit of and shall be binding upon the parties, Owner's successors and assigns and WPM's permitted successors and assigns.

18.   __Survival.__  The provisions of Sections 2.7, 2.8, 4, 6, 7, 10, 12, 17 including all subsections thereof in this Agreement shall survive expiration of this Agreement.

19.   __Counterparts.__  This Agreement may be executed in counterparts, and each such counterpart hereof shall be deemed to be an original, but all such counterparts together shall constitute but one agreement.  Said executed counterparts may be delivered by email or facsimile transmission of copies thereof. Facsimile or e-mailed copies of signed signature pages shall be treated as if they were originals.

[THE REMAINDER OF THIS PAGE IS LEFT BLANK INTENTIONALLY. SIGNATURE PAGE FOLLOWS]

Attachment B

**PX 36, 3396**

In witness whereof, the parties have duly executed this Agreement on the date stated below their signatures.

**SOCIALLY ACCEPTED, LLC**

By: RYAN Henry MASti

Name: Ryan Henry Masti

Title: OWNER

Date: 2/23/2016

**WPM LICENSING PARTNERS, INC.**

By: 

Name: 

Title: CEO

Date: 2/26/16

1

Attachment B

PX 36, 3397

INVENTION IDEAS          SUCCESS STORIES          REVIEWS          SUBMIT IDEA          GET FREE INFO

GENERAL NEWS          INVENTION, IDEA & PATENT          PATENTS TRADING          EDUCATION CENTER

SUCCESS STORIES          TRADE SHOWS

# World Patent Marketing Signs Licensing Agreement to Develop Social Media App for the Disabled Community

Mar 1, 2016 By **Eliza Van Dorn** — Leave a Comment

## New Social Media App for the Disabled Community Promotes Friendship, Transforms Lives

World Patent Marketing has signed an exclusive licensing agreement to develop and distribute "Socially Accepted," a new Social Media App for the Disabled Community. This important project will offer the disabled community quality social media connections for the first time ever. The disabled community has been dramatically under-served by existing social media platforms, and Socially Accepted is expected to fulfill a valuable role within this extremely diverse community.

Leave a message

Attachment C

PX 36, 3398

Case 1:17-cv-20848-DPG   Document 47-6   Entered on FLSD Docket 04/05/2017   Page 23 of 33

3/19/2017          World Patent Marketing Signs Licensing Agreement to Develop Social Media App for the Disabled Community - World Patent Marketing Blog

"Socially Accepted has fabulous growth potential," said Scott Cooper, CEO and Creative Director of World Patent Marketing. "Nearly one in five Americans have a disability. At World Patent Marketing, we believe in developing the potential of every child and adult on the planet, that is why we created The Cooper Idea Foundation, which provides educational and developmental support to children and their families around the world. Socially Accepted can help a huge group of people who have been left on the sidelines of the social media revolution. It will give them contacts, friendships and a community. It can change lives."



**Socially Accepted connects the disabled community.**

"We couldn't turn this project down," said Jerry Shapiro, Director of



**This app gives social media access to all people.**

Manufacturing at World Patent Marketing. "The inventor has come up with some truly unique features, that make this social media app for the disabled community a winner. He works professionally with the disabled community, so he has a deep understanding of the needs and challenges this community faces. He has put together a package that is going to be a breakthrough for the disabled."

World Patent Marketing will oversee the development and distribution of this important Social Media App.

# World Patent Marketing Social Media App Puts the Disabled Community Front and Center

Typical social media presents both physical and emotional challenges for the disabled. The vision for Socially Accepted is that anyone, and everyone will be able to work with the mobile app interface. It will be designed to work equally well touch-free, sound-free, or with voice and

Case 1:17-cv-20848-DPG   Document 47-6   Entered on FLSD Docket 04/05/2017   Page 24 of 33

3/19/2017          World Patent Marketing Signs Licensing Agreement to Develop Social Media App for the Disabled Community - World Patent Marketing Blog

One of the most important features of Socially Accepted, is that it takes a unique approach to connecting members of the disabled community. Typical social media platforms leave it to the user to establish their own connections, most start with family and friends, and build a rich network on that basis. However, people with disabilities often struggle with profound social isolation. Socially Accepted overcomes this obstacle by automatically connecting members of the community who have similar needs. For example, deaf users can be connected to the larger community of hearing impaired people across the country. This introductory



**The disabled will benefit from online friends.**

matching can establish a sense of shared community, support and belonging.

"I work with disabled people all day. They do not have targeted access to social media streams and norms for friends of similar disabilities," said the inventor Ryan, who suffers from ADHD. "They can't wait to connect with this app to other families, share their experiences, and develop friendships. *They have no "Facebook friends."* The professionals at World Patent Marketing have been extremely helpful *every step* of the way from patenting, to the marketing and development phases. Without Scott Cooper and Jerry Shapiro, I would not be able to advance this concept to help millions of disabled people connect, learn from others' experiences, and get up to date information and help."

Socially Accepted will have a profound impact within the disabled community. It will ultimately enrich their lives.

Find out how to patent an invention with World Patent Marketing. See what our customers have to say at World Patent Marketing Reviews.

Filed Under: **Success Stories**

## Leave a Reply

You must be **logged in** to post a comment.

3/19/2017                                  Gmail - Checking in for launch

# M Gmail                                                    ryan masti ▮▮▮▮▮▮▮

---

## Checking in for launch
2 messages

---

ryan masti ▮▮▮▮▮▮▮                                      Mon, Jul 25, 2016 at 12:05 PM
To: Jerry Shapiro <jerry@worldpatentmarketing.com>

Hey Jerry just checking in August 1st is week away wondering how are things going

Thank you
Ryan

On Jul 5, 2016 12:23 PM, "Jerry Shapiro" <jerry@worldpatentmarketing.com> wrote:

Hello Ryan,

Thank you for your email, I hope all is well!

Scott has mobile app on-boarding this week so we can move onto testing the app.

We are still on schedule for product launch.

We will keep you posted on all development, speak soon, have a great day!

On Tue, Jul 5, 2016 at 12:15 PM, ryan masti ▮▮▮▮▮▮▮ wrote:

Jerry checking on invention seeing how things are going and ready for August launch
Thanks
Ryan

On Jun 8, 2016 12:52 PM, "ryan masti" ▮▮▮▮▮▮▮ wrote:

Ok sounds good thanks for the help Jerry

On Jun 8, 2016 12:49 PM, "Jerry Shapiro" <jerry@worldpatentmarketing.com> wrote:

yes correct

On Wed, Jun 8, 2016 at 12:48 PM, ryan masti ▮▮▮▮▮▮▮ wrote:
so estimated time around august september time frame

On Wed, Jun 8, 2016 at 12:47 PM, Jerry Shapiro <jerry@worldpatentmarketing.com> wrote:

Yes we are, 6 month development

On Wed, Jun 8, 2016 at 12:45 PM, ryan masti ▮▮▮▮▮▮▮ wrote:
Also do you have est time when everything will be ready to go are we still planning on around that 6month
time frame from march
Thanks
Ryan

On Wed, Jun 8, 2016 at 12:20 PM, ryan masti ▮▮▮▮▮▮▮ wrote:
Looks good jerry this is great work i very much approve of it.

Thanks jerry so much for what you do!

Attachment D

**PX 36, 3401**

3/19/2017                                                  Gmail - Update on app

# ◯ Gmail

ryan masti ▮▮▮▮▮▮▮▮

---

### Update on app

---

Jerry Shapiro <jerry@worldpatentmarketing.com>                Tue, Dec 13, 2016 at 2:51 PM
To: ryan masti ▮▮▮▮▮▮▮

Hello Ryan,

Thank you for your email, I hope you are doing well!

Meeting went great, we are just making some last minute updates to the app functionality, before it is submitted, uploaded and launched on the Apple store. The app must be 100% functional before submitted to Apple.

They are also preparing the app description and features which will showcase Socially Accepted on the Apple store.

It's been confirmed that complete launch will take place within the next (3-7) business days.

Complete launch means the app is readily available and downloadable on the Apple store.

I will send more details shortly, as we are approaching the finish line.

Thank you for your patience and have a great day.


**Jerry Shapiro**
Director of Manufacturing and Product Development
Jerry@worldpatentmarketing.com
888-926-8174 | Ext: 263
Direct: 917-398-2261 | Fax: 888-689-2485

World Patent Marketing
1680 Meridian Avenue, Suite 600
Miami Beach, FL 33139
https://worldpatentmarketing.com
Join The Invention Revolution





Attachment E

**PX 36, 3402**

3/19/2017                                          Gmail - Meeting apple statues

# M Gmail                                          ryan masti ████████████████

---

## Meeting apple statues
2 messages

---

**ryan masti** ████████████████                              Tue, Jan 17, 2017 at 10:10 AM
To: Jerry Shapiro <jerry@worldpatentmarketing.com>

Any news from app or statues from Apple.

Sent from my iPhone

---

**Jerry Shapiro** <jerry@worldpatentmarketing.com>              Tue, Jan 17, 2017 at 2:19 PM
To: ryan masti ████████████

Hello Ryan,


I hope you are doing well!

Our Developers are still working with Apple on getting pending approval for distribution
on the Apple Store...



Jerry Shapiro

Attachment F

**PX 36, 3403**

Socially Accepted - Coming Together for Social Acceptance



LEARN MORE          Contact



# SOCIALLY ACCEPTED

## GET CONNECTED. STAY ACCEPTED.

This is a new app and internet service that has been created for the disabled community. It provides social networking, much like Facebook and Instagram, but with a few important differences.

One of the biggest challenges for the disabled community is overcoming social isolation, especially when their disabilities are emotional or cognitive. Socially Accepted provides

**Attachment G**

3/24/2017

**PX 36, 3404**

Socially Accepted – Coming Together for Social Acceptance

introductions and actively helps members of the community to connect and interact. The active introductions and groups help these individuals who are often profoundly socially isolated. With Socially Accepted, they will find friendly communities of people who have challenges like their own. It is a breakthrough for a community which can benefit greatly from the opportunities provided by social networking.

  

## Contact Us Today

Have a question? Fill out the contact form. We'd love to hear from you.

Your Name (required)

Your Email (required)

Subject

Your Message

SEND

**WORLDWIDE HEADQUARTERS**

Attachment G

3/24/2017

**PX 36, 3405**



Socially Accepted was developed by World Patent Marketing. To get a free evaluation today, Submit Your Patent or Invention Idea.

- World Patent Marketing
- Invention Blog
- Invention News
- Invention TV
- Inventions on Twitter
- Inventions on Pinterest

1680 Meridian Avenue, Suite 600
Miami Beach, Florida 33139
P. 888 926 8174
F. 888 689 2485

info@worldpatentmarketing.com

© Copyright 2017  |  All Rights Reserved  |  A World Patent Marketing Product

**Attachment G**

Socially Accepted – Coming Together for Social Acceptance



LEARN MORE          Contact



# SOCIALLY ACCEPTED

## GET CONNECTED. STAY ACCEPTED.

This is a new app and internet service that has been created
for the disabled community. It provides social networking,
much like Facebook and Instagram, but with a few important
differences.

One of the biggest challenges for the disabled community is
overcoming social isolation, especially when their disabilities
are emotional or cognitive. Socially Accepted provides

**Attachment G**

**PX 36, 3407**

Socially Accepted - Coming Together for Social Acceptance

introductions and actively helps members of the community to
connect and interact. The active introductions and groups help
these individuals who are often profoundly socially isolated.
With Socially Accepted, they will find friendly communities of
people who have challenges like their own. It is a
breakthrough for a community which can benefit greatly from
the opportunities provided by social networking.

  

## Contact Us Today

Have a question? Fill out the contact form. We'd love to hear from you.

Your Name (required)

Your Email (required)

Subject

Your Message

SEND

**WORLDWIDE
HEADQUARTERS**

**Attachment G**

3/24/2017

**PX 36, 3408**

Socially Accepted - Coming Together for Social Acceptance


WORLD PATENT MARKETING

Socially Accepted was developed by World Patent Marketing. To get a free evaluation today, Submit Your Patent or Invention Idea.

- World Patent Marketing
- Invention Blog
- Invention News
- Invention TV
- Inventions on Twitter
- Inventions on Pinterest

1680 Meridian Avenue,
Suite 600
Miami Beach, Florida
33139
P. 888 926 8174
F. 888 689 2485

info@worldpatentmarketing.com

© Copyright 2017   |   All Rights Reserved   |   A World Patent Marketing Product

Attachment G

3/24/2017
PX 36, 3409