# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-cv-20848-GAYLES

**FEDERAL TRADE COMMISSION,**
　　　**Plaintiff,**

**v.**

**WORLD PATENT MARKETING, INC., et al.,**
　　　**Defendants.**

_____/

## PRELIMINARY INJUNCTION

**THIS CAUSE** comes before the Court on Plaintiff Federal Trade Commission's ("FTC") Emergency *Ex Parte* Motion for a Temporary Restraining Order [ECF No. 4]. The Court has reviewed the Motion and the record and is otherwise fully advised.

## I.　　PROCEDURAL BACKGROUND

On March 6, 2017, the FTC filed its Complaint for Permanent Injunction and Other Equitable Relief [ECF No. 1], against Defendants World Patent Marketing, Inc. ("WPM"), Desa Industries, Inc. ("Desa Industries"), and Scott Cooper ("Cooper"), alleging that Defendants violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). In conjunction with the Complaint, the FTC filed an Emergency *Ex Parte* Motion for a Temporary Restraining Order [ECF No. 4]. On March 7, 2017, the Court entered a Temporary Restraining Order and froze all of Defendants' assets, including Cooper's personal assets. [ECF No. 11]. The Court also appointed Receiver Jonathan Perlman (the "Receiver") to administer the affairs of the Corporate Defendants and to take necessary actions to protect consumers. [*Id.*].

On April 6 and April 20, 2017, the Court held an evidentiary show cause hearing on the FTC's request for preliminary injunctive relief.[1] The FTC relied on approximately 59 exhibits, the Receiver's First Interim Report ("RR") [ECF No. 46], and the testimony of five witnesses: Ryan Masti, a WPM customer; Steven Harris, a WPM customer; Christopher Seaver, a WPM customer; Reeve Tyndall, an FTC investigator; and Jonathan Perlman, the Receiver. Defendants cross-examined all of the witnesses and relied on approximately 24 exhibits.

On May 25, 2017, the FTC filed an Amended Complaint for Preliminary Injunction and Other Equitable Relief [ECF No. 84]. On June 15, 2017, Defendants moved to dismiss the Amended Complaint [ECF No. 92].

## II.     BACKGROUND

### A.     *The Parties*

The FTC is an independent agency of the U.S. Government, which is authorized to initiate federal district court proceedings to enjoin unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. §§ 41, 45(a), 53(b).

Cooper is the founder and owner of WPM and Desa Industries. Plaintiff's Exhibit ("PX") 30, ¶¶ 61–64. WPM was incorporated in Florida on September 16, 2014. PX 30, ¶ 64. Desa Industries was incorporated in Delaware on February 5, 2010, and filed as a foreign for-profit corporation with the State of Florida on February 28, 2014, and with the State of New York on April 21, 2014. PX 30, ¶¶ 61–63. WPM and Desa Industries have shared ownership, office space, and marketing materials, as well as commingled funds. *See* PX 26, ¶ 10; PX 30, ¶¶ 72(a), 75–77.[2]

---

[1]   At the hearing, the Court also ruled that Cooper was entitled to partial relief from the Asset Freeze and authorized him to withdraw $75,000 to be used to pay his legal fees and living expenses. [ECF No. 71].

[2]   For purposes of this Preliminary Injunction, when the Court refers to WPM, it also refers to Desa Industries.

Since 2014, Defendants have marketed and sold research, patenting, and invention-promotion services to consumers. *See* RR ¶¶ 97–98, 100–01, 103. Cooper's financial disclosures show that WPM's gross revenue from November 1, 2014, through January 31, 2017, totaled $25,987,192. RR ¶ 87.

**B.** **Defendants' Business Model**

Defendants operated under their first business model from March or June 2014 to October 2016. RR ¶ 97. Under this model, potential customers learned about WPM after seeing WPM's television or internet advertisements. *See* Hearing Transcript ("HT") at 24, 87–88. Potential customers who visited WPM's website would find success stories, testimonials, logos of major retailers in which customers' products were sold, and a listing of WPM's Advisory Board. *See* HT at 57, 117; PX 27, Atts. B–C, E, J–Z, AA, BB, CC. Potential customers relied on the content of WPM's website—which contained a series of misrepresentations—in deciding whether to contact WPM. *See* PX 4, ¶ 37; PX 7, ¶ 3; PX 10 ¶¶ 2, 7–8; PX 11, ¶ 2; PX 12, ¶ 3; PX 13, ¶ 5; PX 16, ¶ 4; PX 17, ¶¶ 6, 19.

Upon contacting WPM, potential customers would receive calls from WPM salespeople who directed them to submit their ideas in writing through WPM's website. *See* HT at 24–25. After potential customers submitted their ideas online, WPM salespeople would call the potential customers to tell them that WPM's review team was taking time researching their proposed ideas because "[t]he company is so selective with the ideas they choose to work with." PX 53, Att. B, p. 3735. After that call, WPM salespeople would follow-up with potential customers and recite the following sales script:

> We had our final meeting with the Review Team regarding your idea. And basically from all the research that's been done on (*your idea)*, the research tells us there's definitely potential to patent your idea. Because of that, I have the green light from the company to let you know that WPM wants to be a part of your new product idea and help you to

protect it and bring it to the commercial marketplace. So, first of all congratulations! . . . First of all, let me tell you that, the company <u>loved your idea! They think it has a lot of potential.</u> Especially the Sr. Product Director, who is in charge of which ideas are considered for the upcoming trade show. He sees some good opportunities ahead.

PX 53, Att. B, p. 3740. As detailed below, there is no evidence WPM ever had a review team or rejected a large number of ideas.

After informing potential customers that WPM's review team had approved their ideas, WPM salespeople would pitch the potential customers to spend up to $2,000 to purchase WPM's first service, which they called the Global Invention Royalty Analysis ("GIRA"). *See* PX 4, ¶ 4; PX 9, ¶¶ 8, 10; PX 29, Att. A, ¶ 14. The GIRA included a preliminary patent drawing, a patent search report that searched for prior art, a market demographic psychographic report that highlighted industry challenges, and a "score" that signified the extent to which a customer's idea was patentable and marketable. WPM salespeople told customers that the GIRA contained a marketability study created by their "Harvard University & MIT Research Team," which assessed business risk factors, market demand, acceptance for the product, and competition. PX 1, Att. A, pp. 58–62.[3] While waiting for their GIRA reports, customers received calls from WPM salespeople who told them that the "University" had given WPM "the green light to continue with [their] invention[s]." PX 53, Att. B, p. 3746. As detailed below, there is no evidence WPM had any relationships with Harvard, MIT, or any other universities.

After customers received their GIRA reports, WPM salespeople encouraged customers to purchase one of WPM's patent application packages, which were detailed in a "10 Point Patent Protection & Publicity Commitment" ("PPPC") brochure and ranged from $8,995 to $64,995. *See* HT at 38, 94–95; PX 8, ¶¶ 6–7; PX 16, ¶ 15, Att. C, pp. 1800–01. In addition to detailing different types of patent applications, the PPPC brochure listed promotional services for

---

[3]  Defendants later changed the marketability study to InventBoost and similarly claimed that a business team from Ivy League institutions developed InventBoost's methodology. PX 4, Att. E, p. 432.

customer products including 3D models, press releases, webpages, and other marketing materials. *See* PX 1, pp. 63–79. WPM salespeople encouraged customers to purchase one of their pricier packages—the "Global Patent Application"—which they claimed would enable customers to obtain a "global patent" that would be valid in the United States and in hundreds of other countries without paying any additional fees. *See* PX 1, ¶¶ 6–7; PX 2, ¶ 7; PX 4, ¶ 9; PX 16, ¶¶ 15–16, 22; PX 53, App. B, pp. 3748–49. As detailed below, a global patent does not exist.

Once customers purchased patent application packages, Defendants referred the customers' ideas to Marina Mikhailova—a contract patent agent—who submitted applications to the U.S. Patent and Trademark Office ("PTO") on behalf of the customers. *See* PX 19, ¶¶ 5–6. The customers provided their powers of attorney to Mikhailova who communicated directly with the PTO. *Id.* at 6. Defendants directed Mikhailova not to speak with, or write to, her clients, and Defendants' general practice was to withhold Mikhailova's contact information from customers. PX 19, ¶ 6. As a result, Mikhailova typically submitted deficient applications or applications for which she did not receive prior customer consent. *See* PX 6, ¶ 14; PX 7, ¶ 10; PX 11, ¶ 14; PX 23, ¶ 12. When the PTO rejected the applications, Defendants failed to make changes or made changes that did not alter the deficiency of the applications, and the PTO either rejected the applications or considered them abandoned. *See* PX 9, ¶¶ 76, 78; PX 17, ¶¶ 73, 81–82, 95, 98; PX 19, Att. B, pp. 2111–12; PX 23, ¶¶ 18–19. When WPM customers asked for updates on the status of their patent applications, they were often given optimistic news or marketing materials to string them along. *See* PX 4, ¶ 44; PX 5, ¶¶ 57–59; PX 6, ¶¶ 17, 25–26, 32; PX 7, ¶¶ 14–16, 18–40; PX 10, ¶¶ 19–26; PX 16, ¶¶ 35, 37, 40.

### C.    *Modified Business Model*

In September 2016, Defendants shifted from their first business model, which focused on patent acquisition, to their second business model, which focused on product development and marketing. RR ¶¶ 83, 101, 104. The second business model provided two main services or products: (1) a Patent Invention and Intelligence Report ("PIIR") and (2) Smart Product Building ("SPB"). *Id.* ¶ 101. The PIIR cost between $675 and $1,695, depending on the invention and amount of research involved. PX 30, ¶ 38. Unlike the GIRA, the PIIR did not advise customers on the likelihood of obtaining patents. *See* Defendants' Exhibit ("DX") J–K. However, the emails accompanying the PIIRs sent to customers contained congratulatory language and an estimated range of the value of their patents. RR ¶ 120. From January 2017 to March 2017, WPM salespeople sent approximately 100 congratulatory emails, which provided patent valuations ranging from $1.05 million to $4 million. RR ¶¶ 120, 123; *see also* Receiver's Exhibit ("RX") U.

The SPB Reports were similar to the PPPC, but Defendants allege that the reports did not offer any patent application services. RR ¶ 103. The SPB Reports purportedly offered press releases and licensing outreach, as well as separate packages for branding services, digital marketing, e-commerce services, prototype building, manufacturing products with WPM China, and patent referral services. *See* DX L; RR ¶ 103.

### D.    *Defendants' Misrepresentations*

Defendants made a series of misrepresentations to potential customers to induce them to purchase WPM services. Even after customers made initial investments, Defendants continued making misrepresentations to induce them to purchase more services and to make larger investments.

### 1. Misrepresentations regarding Major Retailers

WPM was started between February 2014 and June 2014, yet WPM's homepage from April 2014 displayed logos of Target, Walmart, and Home Depot, and represented that these retailers sold WPM's customers' products. HT at 261–62; RR ¶ 97; PX 53, Att. J, p. 4726. At the show cause hearing, Defendants' counsel conceded that the representation was false but argued that the April 2014 version of WPM's website was taken down nearly two years ago. HT at 317–18. However, a more recent version of the homepage that was live until at least February 2017 also displayed the logos of Target, Walmart, Home Depot, Walgreens, Best Buy, and others and represented that "[s]ome of the world's most respected brands trust World Patent Marketing." *See* PX 27, Att. B, pp. 2269–71. A lead paralegal for Target Corporate Services, Inc., stated that neither WPM nor Desa Industries has had a relationship with Target and she was unable to locate any information about either entity in Target's database. PX 51, ¶ 3.

### 2. Misrepresentations regarding the History Channel

WPM salespeople sent marketing emails to customers, which stated that the History Channel did a special episode on WPM. *See* PX 9, ¶¶ 38, 48–49; PX 11, Att. E, p. 1150. When Reeve Tyndall, the undercover FTC investigator, contacted WPM in January 2017, a WPM salesperson told him that the History Channel did a "whole segment" on WPM and invited him to watch the video. PX 30, ¶ 15. In reality, however, Defendants paid $17,170 to air their own commercial on the History Channel, and it aired only once—at 6:00 a.m. on January 29, 2015. PX 18, ¶¶ 2–5. Defendants' counsel conceded at the hearing that the History Channel did not do a special episode on WPM. HT at 319.

### 3. Misrepresentations regarding WPM's Relationship with the Snuggie

From August 2016 to February 2017, WPM salespeople disseminated a press release, which stated that WPM had "[j]oin[ed] [f]orces" and "partner[ed] up with" the developer of the

Snuggie. *See* PX 30, ¶ 60(b), Att. P, p. 2874. However, Allstar Marketing Group, LLC, the developer of the "Snuggie," stated in a sworn declaration that Allstar has never had a business relationship with WPM but had only discussed the possibility of doing business with WPM. PX 28, ¶¶ 2–3, 5. In February 2017, Allstar learned that WPM was touting a relationship with it, and as a result, Allstar asked WPM to cease making any claims that it has a business relationship with Allstar or the Snuggie. *See* PX 28, ¶¶ 4, 6.

Defendants argue that their representation that they had partnered with Allstar Marketing is accurate because an August 2016 email from Allstar's Marketing Director introduced Cooper as a "valued partner." *See* DX U. This is consistent with Allstar's statement that they explored a partnership with WPM in or around August 2016. *See* PX 28, ¶ 5.

### 4. Misrepresentations regarding WPM's Relationship with Harvard, Baylor, and MIT

In marketing materials and telephonic communications, Defendants told customers that the market analysis portion of the GIRA was performed by "researchers" from well-known universities such as Harvard, Baylor, and MIT. *See* PX 10, ¶ 4; PX 12, ¶ 22; PX 14, ¶ 5, Att. B, pp. 1517–21. Although Professor David Allen from Baylor University prepared the market analyses for a short period of time, those evaluations were not prepared by or authorized by Baylor University. RR ¶ 131. Defendants replaced Professor Allen with Rohit Goyal, a graduate student at Harvard University, to perform the market analysis. According to his resume, Goyal did not attend MIT. *See* DX E. In July 2015, an attorney representing Harvard University in intellectual property matters wrote to Cooper and asked him to revise his press releases to remove references to Harvard. PX 59. There is no evidence that Harvard, Baylor, or MIT ever maintained a relationship with WPM.

### 5. Misrepresentations regarding Success Stories and Customer Reviews

WPM's website has a section for "success stories," where Defendants list inventions that purportedly have become successful with WPM's assistance, and it contains testimonials of inventors who praise WPM and Cooper. *See* PX 27, Atts. E, J–Z, AA, BB, CC. WPM salespeople

also relayed success stories to customers through telephonic communications. *See* PX 3, ¶¶ 6–7; PX 8, ¶ 4; PX 10, ¶ 7. However, many inventors listed as "success stories"—including the inventors of Supreme Diva Jeans, Live Expert Chat, Teddy's Ballie Bumpers, the Bimini Top Push Mower, Smart Net, and Green Leaf—did not receive patents, bring their products to market, or realize financial gain as a result of working with Defendants. *See* PX 5, ¶ 60; PX 7, ¶¶ 38–40, 43; PX 9, ¶¶ 84–86; PX 10, ¶¶ 27, 30; PX 31, ¶ 31; PX 38, ¶¶ 24–27.

For example, Teddy's Ballie Bumpers' success story represented that "World Patent Marketing secured a US Utility Patent for [Steven Harris's] pet patent," and that "online sales [had] started" for the product. *See* PX 27, Att. P, p. 2516. In another article, Defendants stated that "[t]hey helped [Harris] refine the idea and arranged for a licensing deal to provide [Harris] with the capital he needed to pursue his dream. And in less than a year, [Harris] went from average guy to World Patent Marketing Success Story, with a nationally known televised product that is poised to take-off big time!" PX 27, Att. P, p. 2530. Harris's testimony at the show cause hearing belied Defendants' "success story." HT at 104–05. He testified that Teddy's Ballie Bumpers cannot be patented because there is already a patent for a similar product, but that fact did not show up in WPM's analysis of the product. *Id.* at 103–05; *see also* PX 9, ¶¶ 80, 83. Despite paying Defendants nearly $20,000, Harris has not made any money from his invention, and Defendants did not fulfill any of their promises such as acquiring a patent for Harris, making him a commercial, negotiating a manufacturing deal, showcasing his product at trade shows, or selling his product. PX 9, ¶¶ 83–84. Customers like Crystal Carlson, Betty Forsythe, and Michael Trew relied on Harris's success story when deciding to reach out to WPM to purchase their services. *See* PX 4, ¶ 2; PX 5, ¶ 4; PX 13, ¶ 5.

Defendants also listed Supreme Diva Jeans as a success story and implied that they procured a "jeans patent" for the inventor. *See* PX 27, Att. N, p. 2475. In an article about Supreme Diva Jeans, Cooper stated that WPM "transformed this product and helped the inventor to refine it" by "spen[ding] months in the final design stages, working with numerous design experts and testing multiple facilities, fabrics, and details." *Id.* at p. 2493. However, a year after

the success story was published, the Supreme Diva Jeans inventor learned that the PTO contacted WPM because there was information missing in her utility patent application; but because no one from WPM responded with the missing information, the PTO rejected her application. PX 5, ¶¶ 26, 28, 42. After two-and-a-half years of working with Defendants, the inventor spent nearly $40,000 but received only a prototype, some samples, and a press release in return. PX 5, ¶¶ 60–61.

Like Teddy's Ballie Bumpers and Supreme Diva Jeans, Live Expert Chat's success story stated that the inventor's product was a "patented technology" and that Defendants "provided vital seed money and resources in exchange for a 50% percentage in the company." PX 27, Att. S, pp. 2553–54; *see also* PX 27, Att. S, p. 2575 (referring to Live Expert Chat as a "software patent" and a "social media patent"). Although Defendants told the inventor that they filed a utility patent application for him, they actually filed a provisional patent and let it expire. PX 7, ¶ 36. After spending thousands of dollars over two-and-a-half years, Live Expert Chat's inventor received some marketing materials, but never received a patent, a prototype, money, or a 50/50 deal with Cooper as a result of working with Defendants. PX 7, ¶¶ 38, 39, 43.

WPM's website also had a section that displayed positive customer reviews. *See* PX 27, Att. E. However, Defendants asked customers to write positive reviews and create video testimonials at the beginning of the process, *before* they could properly evaluate Defendants' services. *See* PX 5, ¶ 7; PX 7, ¶ 18; PX 10 ¶ 9. In sworn declarations, WPM customers stated that they relied on these positive reviews when deciding to purchase WPM's patent services. *See* PX 3, ¶¶ 6–7, 9; PX 7, ¶ 3; PX 10, ¶ 2; PX 11, ¶¶ 2, 9; PX 16, ¶ 4; PX 17, ¶¶ 6, 19.

### 6. Misrepresentations regarding a Review Team and Rejecting a Large Number of Ideas

WPM salespeople told customers that a "review team" approved invention ideas before moving forward. *See* PX 13, ¶ 7; PX 14, ¶ 3; PX 16, ¶ 8; PX 30, ¶ 21; PX 53, Att. B, pp. 3719, 3721, 3727. However, there is no evidence that a "board" or "review team" reviewed invention

ideas before customers were told their idea had been approved. *See* PX 43, ¶ 9; PX 44, ¶ 6; RR ¶ 26. For example, Johnny Graham ("Graham"), who heads WPM's Chicago office, revealed that salespeople were trained to tell prospective customers that their ideas must first be approved by a nonexistent "board" of experts at WPM. RR ¶ 26. The salespeople would then wait a few days before calling again to "congratulate" the customers, because the (non-existent) board had approved their ideas. *Id.* When Graham started, he believed there must be a review team, and he only later learned this to be untrue. Graham stated that this practice continued through March 2017. *Id.*; *see also* PX 43, ¶ 9 (Declaration of WPM salesperson stating "there was no actual approval process for ideas—it was just me deciding whether something was too crazy or not. I was trained to tell people their inventions were great, regardless of what the inventions were and whether they were actually good or not.").

Sales scripts instructed WPM salespeople to tell potential customers that that a review team rejected a large number of ideas and that WPM was selective with the ideas with which they chose to work. PX 53, Att. B, pp. 3723, 3730, 3735; *see also* PX 3, ¶ 3; PX 4, ¶ 4; PX 30, ¶ 20. However, there is no evidence that Defendants had a sales script for rejecting ideas. *See* PX 44, ¶ 8. Indeed, Graham stated that salespeople were trained to tell prospective customers that their ideas were approved in every situation unless an idea was so outlandish that the customer could be an undercover government agent. RR ¶ 27; *see also* PX 43, ¶ 9 (WPM salesperson stated that "[t]he managers were worried about a government agency calling in to test WPM. Other than that, it didn't matter what a person's invention idea was.").

At the hearing, counsel for Defendants conceded that a large number of ideas were not rejected, but argued that some ideas were rejected. HT at 29, 317. However, Defendants failed to provide evidence establishing that any ideas were rejected. At the hearing, counsel for

Defendants also claimed that they submitted every customer idea to TGK & Associates—a customer service company—for "concept review" and that there was a "cursory" review as to whether ideas had "some level of potential." *See* HT at 22, 315. Although the evidence indicates that TGK & Associates prepared GIRAs, there is no evidence that TGK & Associates reviewed ideas when customers first contacted WPM. *See* RR ¶ 99. Furthermore, Defendants did not start paying TGK & Associates for services until October 21, 2015, long after WPM's salespeople started telling customers that its review team approved their ideas. *See* PX 26, Att. A, p. 2249. Defendants fail to account for the company's review of customer ideas prior to retaining TGK & Associates.

### 7. Misrepresentations regarding the Invention Team Advisory Board

Until at least February 2017, WPM's website, marketing materials, and telephonic communications represented that WPM had an advisory board. *See* PX 32, ¶ 6; PX 33, ¶ 5; PX 27, Att. D, pp. 2285–93; PX 42, Att. A, p. 3498; PX 53, Att. B, pp. 3721–22. For example, one sales script instructed WPM salespeople to tell consumers about the advisory board in order to "[b]uild credibility":

> Have you had an opportunity to see who is on our advisory board? Build credibility take them to the website if you can send them an email with links. VERY IMPORTANT…Oh by the way I'm sending you a link to our World Patent Marketing Advisory Board. You will quickly see we are head and shoulder above our competition [omitted link to youtube video].

PX 53, Att. B, pp. 3721–22. Customers relied on this information in deciding whether to purchase WPM services. For example, one WPM customer indicated in a sworn declaration that he "looked at [the list of WPM's Board of Directors] and thought this is legitimate; otherwise why would these people allow [Cooper] to list them if he was not actually doing things for people." PX 32, ¶ 6; *see also* PX 33, ¶ 5 ("I thought, these famous [board members] wouldn't

recommend the company if the company was not legitimate."). However, at least six Advisory Board members did not advise the company and were not asked to review consumers' inventions. *See* PX 31, ¶ 25; PX 41, ¶¶ 7–9; PX 48, ¶¶ 6–8; PX 50, ¶¶ 8–9; PX 56, ¶¶ 2–5; RR ¶ 135.

### 8. Misrepresentations regarding Trade Shows

WPM salespeople represented to consumers that they would showcase their inventions at trade shows. *See* PX 15, ¶ 13; PX 16, ¶ 18. One sales script, for example, states that WPM would "attend[ ] between 6 and 8 tradeshows every 12 months representing [the customer's] product" and that the tradeshows would be both domestic and international. PX 53, Att. B, p. 3747. Another script states that the WPM salesperson and the "marketing team are 95 percent of the time traveling worldwide to different trade shows." PX 53, Att. C, p. 3758; *see also* PX 53, Att. C, p. 3757 ("My team also attends tradeshows every three weeks to make connections and start relationships with manufacturers."). However, Graham stated that a division manager at WPM told him that "WPM didn't actually go to trade shows." PX 55, ¶ B6. The record reflects that at least one customer indicated that WPM's commitment to market his product at trade shows was one of the reasons he decided to work with WPM. PX 14 ¶ 3 ("I chose to work with World Patent Marketing due to their commitments to me, saying they would run a study with two major colleges to tell whether my invention was feasible, their commitment to fulfill my patent, and their commitment to market my product at trade shows and on websites.").

### 9. Misrepresentations regarding Financial Gain and Success

The record reveals that Defendants' sales scripts instructed WPM salespeople to tell consumers that the review team loved their ideas and that they saw potential in patenting and licensing their ideas. PX 53, Att. B, p. 3740. Another sales script instructs salespeople to tell

consumers that the success rate of receiving a patent filed by WPM "will be higher than 80%." PX 53, Att. C, p. 3762. In sworn declarations, WPM customers stated that in telephonic communications, WPM salespeople told them that they could make millions and billions of dollars from their inventions if they worked with WPM. *See* PX 1, ¶ 6; PX 4, ¶ 12; PX 5, ¶ 55.

Under Defendants' original business model, the GIRA assigned a "score" to consumers' ideas, and WPM salespeople almost always told consumers their inventions scored well and that their ideas were marketable. *See* PX 1, ¶¶ 5–6; PX 3, ¶ 5; PX 4, ¶ 8; PX 9, ¶ 12. And under Defendants' modified business model, Defendants sent approximately 100 emails to consumers relaying the "great news" that their patents were valued from $2.5 million to $4.05 million. RR ¶¶ 120, 122–23; RX U. In his First Interim Report, the Receiver stated that he viewed the value range in the emails to be a direct communication to consumers regarding the value of their patents and that the emails' congratulatory language was a misrepresentation to consumers. *Id.* ¶ 122.

Defendants argue that their website and marketing materials provided disclaimers that warned consumers of the low probability of financial success and of the risks involved in commercializing inventions. For example, Defendants contend the following message on WPM's website homepage serves as a disclaimer: "There are no guarantees. Most inventions fail. Those are the facts. Inventions, patents and product development is [*sic*] not for everybody. It's right for World Patent Marketing. Is it right for you?" DX W. Defendants also point to similar disclaimers in articles published on WPM's website, such as "Why Most Product Ideas and Inventions Fail," "What are my chances of getting rich off a new invention? NOT GOOD!", and "The Patent Bubble." DX A–B, F. Defendants also maintain that the following language contained in the contract to purchase a GIRA is evidence of a disclaimer:

> The purpose of the Global Invention Royalty Analysis is to enable the inventor to professionally prepare and present their invention so it will get the exposure and support that it needs. You never get a second chance to make a first impression. Prematurely presenting an invention will lower your chance of success. No clients have received a net financial profit or licensing agreement solely as a direct result of this Global Invention Royalty Analysis through World Patent Marketing. This is only one piece of the puzzle. Inventors who intend to proceed with a patent application must also present a convincing case for their idea.

PX 17 at 1866. However, as set forth below, Defendants' disclaimers were insufficient and did not correct the misrepresentations made by Defendants.

Further, it is undisputed, and Cooper agrees, that no WPM inventor has ever realized a profit from his or her invention using WPM's services. *Id.* ¶ 141. Nor has any customer, through WPM, sold a meaningful number of units or entered into a significant licensing agreement with a third party to do so. *Id.*

### 10.    Misrepresentations regarding Licensing and Manufacturing Agreements

In telephonic communications and in marketing materials, Cooper and WPM salespeople told consumers that they had negotiated licensing and manufacturing agreements that resulted in the manufacture and sale of their customers' inventions. *See* PX 2, ¶ 18; PX 3, ¶¶ 6–7, Att. D, pp. 183–86; PX 31, ¶ 6; PX 32, ¶ 10. WPM salespeople also told consumers they would receive third-party licensing or manufacturing deals. *See* PX 6, ¶ 6; PX 16, ¶ 27. For example, one sales script states: "Now, regarding manufacturers, as per the USPTO, 2 out of 5 ideas eventually see the marketplace. That is why we take your product to multiple manufacturers so that if one doesn't like your idea there are still hundreds and thousands of other manufacturers that might have an interest in your product." PX 53, Att. C, p. 3762.

However, in sworn declarations, WPM customers indicate that they did not receive lucrative licensing deals or any returns on their investments. *See* PX 1, ¶ 23; PX 2, ¶ 29; PX 4, ¶ 42; PX 31, ¶ 31; PX 32, ¶¶ 31, 34. Indeed, it is undisputed, and Cooper agrees, that no WPM inventor, through WPM, entered into a significant licensing agreement with a third party. RR ¶ 141.

### 11. Misrepresentations regarding a Global Patent

Defendants represented to consumers that WPM's "Global Patent Application" would entitle customers to a global patent for a one-time fee. *See* PX 1, ¶¶ 6–7; PX 16, ¶¶ 15–16, 22; PX 32, ¶ 10; PX 49, ¶¶ 13–16. However, a global patent does not exist. The PTO offers a Patent Cooperation Treaty ("PCT") application, which was part of Defendants' Global Patent Application package. *See* PX 20, ¶ 14; PX 4, Att. C, p. 336. The PCT Application allows inventors to file one application as a placeholder for separate applications in each PCT signatory country; however, inventors then have thirty months to directly request patents from the national patent offices of each country, and they must pay national filing fees and translation fees. PX 20, ¶¶ 14–17. Defendants did not tell customers that the PCT application was only a temporary placeholder, and that customers would need to file separate applications in each country or risk having their applications abandoned. *See* PX 32, ¶¶ 10, 24; PX 46, ¶ 8. Defendants also did not tell customers about any additional fees associated with the PCT application, and neither the PPPC brochure nor the PPPC contract disclosed additional fees associated with the PCT application. *See, e.g.*, PX 32, ¶¶ 10, 24 (Declaration of a WPM customer stating that Cooper "did not explain to [him] that [he] would have to apply to each country individually or pay more money for each additional country"); PX 44, ¶ 11. Instead, a sales script reveals that WPM salespeople were instructed to affirmatively tell consumers that there would be no additional fees. PX 53, App. B, pp. 3748–49.

### 12. Misrepresentations regarding WPM China

In telephonic communications and in marketing materials, Defendants represented to consumers that WPM has a manufacturing plant in China, and referred to it as "WPM China." *See* PX 2, ¶ 7; PX 4, ¶¶ 9–10; PX 10, ¶ 19. WPM China also appeared in sample agreements

with consumers. *See* PX 25, Att. I, p. 2236. Defendants created marketing materials touting licensing deals between "WPM China" and inventors. *See* PX 10, ¶ 30, Att. D, p. 1060; PX 17, Att. B, pp. 1871–73, 1875–77, 1884–87. For example, in one press release regarding the Bimini Top Push Mower, Defendants stated: "The manufacturer is none other than World Patent Marketing China, World Patent Marketing's manufacturing division. World Patent Marketing has exclusively licensed the Bimini Top Push Mower for ten years and will distribute the product worldwide." PX 27, Att. U, p. 2627.

In its marketing materials, Defendants told consumers that WPM had access to a staff on ground in China. PX 3, Att. D, p. 185; PX 6, Att. L, p. 647; PX 7, Att. J, p. 763; PX 17, Att. B, p. 1901; PX 27, Att. P, p. 2517. WPM salespeople also told consumers that in order to take advantage of WPM's manufacturing plant and office in China, they had to purchase the more expensive WPM package for an international patent that included China. *See* PX 2, ¶ 7; PX 4, ¶ 9.

Defendants' business records and email communications reveal that WPM never had a division in China; rather, Cooper concedes that WPM merely had contacts at factories in China that could manufacture various products. RR ¶ 125. Counsel for Defendants confirmed at the hearing that "[t]here is no entity named WPM China" and that "there is no World Patent Marketing affiliate in China." HT at 301–02.

### 13.    Misrepresentations regarding Additional Fees

Customers who signed PPPC contracts with WPM paid $8,995 to $64,995 for various domestic and international patent applications. PX 16, Att. C, pp. 1800–01. At the time customers signed PPPC contracts with WPM, WPM salespeople used sales scripts to tell customers that they would not have to pay another fee. *See* PX 8, ¶ 23; PX 10, ¶ 11; PX 16, ¶ 16;

PX 17, ¶¶ 18, 23; PX 53, Att. B, p. 3739. WPM's contract also stated, in capital letters: "THE INVENTOR WILL NOT BE HELD RESPONSIBLE FOR ANY ADDITIONAL EXPENSES INCURRED OR ASSESSED BY WORLD PATENT MARKETING, OTHER THAN THOSE DEFINED WITHIN THE SCOPE OF THIS AGREEMENT." PX 1, Att. B, p. 87. However, the record indicates that there were instances in which Defendants asked customers for additional fees after they paid for their patent packages. PX 1, ¶ 20; PX 5 ¶¶ 18–19, 47–50; PX 31, ¶¶ 8–12; PX 36, ¶¶ 7, 10–12.

### E.  *Customer Complaints*

Although WPM almost always filed patent applications, customers rarely—if ever— received a patent. *See, e.g.*, PX 1, ¶ 18, 23; PX 4, ¶¶ 40–42; PX 5, ¶ 51; PX 6, ¶ 28; PX 7, ¶ 36; PX 8, ¶¶ 34–36; PX 9, ¶ 76; PX 10, ¶ 27; PX 11, ¶¶ 19, 22–26; PX 15, ¶ 33; PX 19, Att. B, pp. 2111–12; PX 54, ¶ 2. In February 2016, the PTO received a complaint from a WPM customer, which prompted the PTO's Office of Enrollment and Discipline to initiate an investigation into the activities of WPM's patent agent. PX 19, ¶ 6. Defendants concede that in some cases WPM's patent services were flawed, but they attribute the flaws to Mikhailova, and they state that they attempted to remediate problems with patent applications submitted by Mikhailova by transferring her WPM customer files to other patent application vendors. Cooper Decl. ¶ 15. However, Defendants fail to provide evidence that they indeed remediated the problems with the patent applications.

Defendants also argue that unlike a sham company that leaves consumers emptyhanded, Defendants provided real marketing services to consumers. Although WPM customers did receive some marketing materials for their invention ideas such as brochures, press releases, and banner designs, these materials were of poor quality. *See* PX 1, ¶ 19; PX 4, ¶ 42; PX 5, ¶ 60;

PX 6, ¶¶ 22, 26, Att. L, pp. 632–82; PX 8, ¶ 15; PX 9, ¶¶ 35–36, 40–43; PX 10, ¶ 27; PX 15, ¶¶ 28, 30, 32; PX 16, ¶ 34. For example, when a brother and sister who had each ordered GIRAs for separate inventions noticed that the "Unique Aspects" sections of their GIRAs were identical, the sister contacted Graham about the form language. RR ¶¶ 108–09. Alarmed that the GIRAs appeared fraudulent, Graham emailed Cooper, who responded by calling him a "f--king idiot." *Id.* ¶ 115.

And when Defendants did provide tangible products, they were markedly different from their customers' contracted ideas. For example, Ryan Masti testified that Defendants sent him a "splash page" for a website, with the URL GetSocial.life—despite the fact that Masti's product was called "Socially Accepted," and the domain name for "socially accepted" was available. HT at 70–71, 78, 84. It is therefore not surprising that in less than two weeks, the Receiver received over 800 emails from customers, the majority of which contained complaints about WPM. RR ¶ 65.

Despite the poor quality of Defendants' services, customers reported that when they performed due diligence and researched WPM online, they found only positive reviews. *See* PX 1, ¶ 3; PX 3, ¶ 3; PX 4, ¶ 2; PX 6, ¶ 2; PX 7, ¶ 3; PX 8, ¶ 2; PX 10, ¶ 2; PX 11, ¶ 2; PX 13, ¶ 5; PX 16, ¶¶ 3–4; PX 17, ¶ 6. When customers became frustrated and complained to Defendants that WPM did not fulfill its promises, many threatened to report WPM's actions to the Better Business Bureau ("BBB"), offices of state attorneys general, the FTC, and other consumer agencies. *See* PX 1, ¶ 21; PX 3, ¶¶ 20, 33; PX 4, Att. G, pp. 457–58; PX 6, ¶¶ 19–20. In response, Defendants—including Cooper and WPM's head of security—and WPM's lawyers intimidated and threatened customers to prevent them from complaining and to compel them to retract complaints. *See* PX 1, ¶ 21; PX 3, ¶¶ 23, 28–29, 34–37; PX 4, ¶ 39, Att. H, p. 459; PX 5,

¶ 52; PX 6, ¶¶ 19–20, Att. G, p. 614, Att. H, p. 615; PX 11, ¶ 18, Att. J, pp. 1168–69; PX 53, Att. F, pp. 3957, 4045, 4058.

One customer, for example, emailed a WPM board member to inquire whether WPM was a fraudulent company. The board member forwarded the email to Cooper, and Cooper replied to the customer, copied his attorneys, and implicitly threatened the customer with legal action. PX 53, Att. F, p. 4142 ("Hey Genius [ ] I understand you emailed one of my board members telling her you think my company lacks integrity and you think we might be a fraud. Just wanted to let you know that is probably going to be the most expensive email you ever sent. I hope it was worth it . . . meet my attorneys Eric Creizman and Andrew Levi [ ] they really enjoy meeting new people."). When another customer asked for a refund when no work had been done on her invention and mentioned filing a complaint with the BBB, Cooper's lawyer sent her a letter stating that her conduct was "illegal" and she was subject to fines or imprisonment, or both. He told her "you have proceeded far beyond what the law defines as free speech and, instead, have engaged in an unlawful and intentional interruption of World Patent Marketing's business ….World Patent Marketing hereby demands that you immediately cease and desist from making threats to defame it or illegally publish such statements to the Better Business Bureau." PX 3, ¶¶ 14, 19–38, Att. J, pp. 201–02. After months of trying to receive a refund or services, she filed a complaint with the BBB. She received a letter from a second lawyer who told her that seeking a refund constitutes extortion under Florida law and, "since you used email to make your threats, you would be subject to a federal extortion charge, which carries a term of imprisonment of up to two years and potential criminal fines. *See* 18 U.S.C. § 875(d)." PX 3, Att. Q, pp. 210–11; *see also id.* ¶¶ 14, 19–38, Att. J, pp. 201–02.

Defendants also sent emails to WPM customers with links to Cooper's blog, which featured posts about his security detail comprised of ex-Israeli soldiers who "knockout first and ask questions later," his role in having an ex-employee arrested on extortion charges, and a warning to "say a bad word about him and watch his legal team take action"—"[h]e takes it all personally and keeps grudges filed away." PX 27, ¶¶ 41–42, Atts. EE–FF, pp. 2752–79; PX 5, Att. M, pp. 527–29. In response to these and other communications, many customers have reported that they were fearful of Cooper and repercussions if they complained. *See* PX 3, ¶ 33; PX 4, ¶ 39; PX 6, ¶ 19; PX 7, ¶ 37; PX 9, ¶ 79.

F.      ***Ongoing Misrepresentations***

Defendants contend that because they switched from their first business model to their second business model, a preliminary injunction enjoining them from committing deceptive acts or practices under their first business model is moot. [ECF No. 37 at 4]. However, the record reveals that although Defendants may have changed the names of their services, they continue to provide similar services—and similar misrepresentations—under their second business model. In January 2017, the FTC conducted an undercover investigation, which was led by Investigator Tyndall. Tyndall's undercover call revealed that as of February 2017, consumers still paid for an analysis, which Defendants called a PIIR instead of a GIRA. PX 30, ¶¶ 34, 36.

WPM's records also indicate that Defendants sent approximately 100 emails between February 8, 2017, and March 9, 2017, showing that WPM and TGK & Associates have continued to prepare provisional patent applications for customers. RR ¶¶ 116, 118. The email states that WPM's preparation of the provisional patent applications are free, and it then instructs customers to print and sign the provisional patent applications, pay the PTO's filing fee, and mail the applications to the PTO. RX S. The applications appear to be poorly completed and contain

rudimentary drawings, if any. *Id.* ¶ 119. Although marketed as a free service in the email, it is unknown whether some or all of these customers paid WPM for this or other services that WPM provided. *Id.*

And as of March 2017, the PTO was continuing to receive new patent applications from WPM. PX 46, ¶ 4; PX 47, ¶ 5. The Receiver also located a database within WPM's Google Docs, which lists 1,504 customers who had purchased patent-related services including provisional and nonprovisional patent filings. RR ¶ 64. Even if the Court were to find that Defendants' change in business model was more than superficial, Defendants have conceded that they continue to assist existing customers who purchased plans under the first model with their patent applications. [ECF No. 37 at 17]. Accordingly, Defendants misrepresentations can induce existing customers to continue paying for nonexistent and useless services. While Defendants will certainly be permitted to prove that they discontinued their deceptive and unfair acts and practices on a motion for summary judgment or at trial, the current record does not support their claim.

## III.  CONCLUSIONS OF LAW

The FTC Act "empower[s] and direct[s]" the FTC to prevent "unfair or deceptive acts or practices" in the marketplace. *See* 15 U.S.C. § 45(a). The statutory scheme underlying the FTC Act provides the FTC "an influential role" in interpreting whether an act or practice is "unfair or deceptive" under Section 5 of the Act. *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 384–85 (1965); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242–43 (1972). "Moreover, as an administrative agency which deals continually with cases in the area, the [FTC] is often in a better position than are courts to determine when a practice is 'deceptive' within the meaning of the Act." *Colgate-Palmolive*, 380

U.S. at 385. As such, "the [FTC's] judgment is to be given great weight by reviewing courts." *Id.* It is with this deferential framework in mind that the Court makes the following conclusions of law.

A.     *Standards for Granting a Preliminary Injunction*

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this Court to grant, preliminary and permanent injunctive relief enjoining violations of Section 5 of the FTC Act, as well as "any ancillary relief necessary to accomplish complete justice." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir. 2011) (per curiam) (quoting *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (per curiam)). The purpose of a preliminary injunction is to maintain the status quo pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Id.* Because the procedures are less formal, the evidentiary rules are relaxed and the Court is permitted to rely on evidence that might not be admissible for a permanent injunction, "so long as the evidence is appropriate given the character and purpose of the injunction proceedings." *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1360 (S.D. Fla. 2012) (citing *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) and *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310–13 (11th Cir. 1998)).

"For the FTC to obtain injunctive relief, it must show that (1) it is likely to succeed on the merits, and (2) injunctive relief is in the public interest." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014) (citing *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217–18 (11th Cir.

1991)). Unlike private litigants, the FTC is not required to demonstrate irreparable injury to obtain injunctive relief. *IAB Mktg.*, 746 F.3d at 1232.

**B.** *Likelihood of Success on the Merits*

The FTC alleges that Defendants violated Section 5(a) of the FTC Act by making a series of material misrepresentations that misled consumers and by unfairly suppressing consumer complaints. Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

**1.    Deception**

To establish that an act or practice is deceptive under Section 5(a) of the FTC Act, "the FTC must establish that (1) there was a representation, (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). When assessing whether a representation is likely to mislead consumers acting reasonably under the circumstances, courts consider the "overall, net impression rather than the literal truth or falsity" of the representation. *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (per curiam) (citing *FTC v. Peoples Credit First, LLC*, No. 03-2353, 2005 WL 3468588, at *5 (M.D. Fla. Dec. 18, 2005), *aff'd*, 244 F. App'x 942 (11th Cir. 2007) (per curiam)).

"A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (citation omitted). "If a significant number of prospective purchasers are likely to attach importance to the representation in determining whether to engage in a proposed transaction, the representation is material." *FTC v. Washington Data Resources*, 856 F. Supp. 2d 1247, 1272–73 (M.D. Fla. 2012)

(quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3, cmt. b (1995)). "Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material." *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267 (citation omitted). "Express claims directly represent the fact at issue while implied claims do so in an oblique or indirect way." *Kraft, Inc. v. FTC*, 970 F.2d 311, 318 n.4 (7th Cir. 1992). Implied claims are material if there is evidence that the seller intended to make the claims or if the claims address the central characteristics of the product or service offered. *See Novartis Corp. v. FTC*, 223 F.3d 783, 786–87 (D.C. Cir. 2000); *Kraft*, 970 F.2d at 322; *see also FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 604 (9th Cir. 1993) ("[N]othing in statute or case law [ ] protects from liability those who merely imply their deceptive claims; there is no such loophole.").

As detailed above, the record supports a finding that Defendants made a series of misrepresentations to consumers—many of which Defendants concede were false—and that these misrepresentations influenced consumers' decisions to purchase Defendants' services. Defendants' misrepresentations include that:

(1) Purchase of Defendants' invention-promotion services is likely to result in financial gain for their customers;

(2) Defendants have successfully marketed the invention ideas of many of their customers, resulting in royalties or sales of their inventions;

(3) Defendants successfully marketed specific invention ideas, such as Teddy's Ballie Bumpers, Live Expert Chat, and Supreme Diva Jeans;

(4) Consumers who buy one of Defendants' "global" packages will receive a globally-applicable patent;

(5) Defendants have regularly negotiated licensing and manufacturing agreements that have resulted in the manufacture and sale of their customers' inventions;

(6) Consumers who buy Defendants' invention-promotion services will not have to pay any more money to receive Defendants' promised services; and

(7) Defendants' "review team" approves customer ideas and rejects a large number of them.

These misrepresentations are likely to mislead consumers acting reasonably under the circumstances because they provide the net impression that Defendants will provide the promised services and results.

Defendants' representations are also material: they consist of both express claims and deliberately made implied claims that would induce the purchase of Defendants' services. For example, one sales script states that consumers who purchase a "global" package will receive a globally-applicable patent at no additional cost. Likewise, one of WPM's contracts expressly states in capital letters that consumers who contract with Defendants will not have to pay additional money to receive Defendants' promised services. And emails assigning million-dollar valuations to consumers' patents and describing these valuations as "great news" are express claims on which a reasonably prudent person *would* rely in deciding whether to purchase Defendants' services.

In deciding whether to purchase Defendants' services, a reasonably prudent person would also rely on success stories of WPM customers receiving patents and receiving licensing deals as a result of working with WPM. These representations are not, as Defendants contend, mere puffery [ECF No. 37 at 29–31]; rather, Defendants' success stories contain "specific and measurable claims and claims that may be literally true or false." *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 11 (1st Cir. 2010) ("Where a claim is merely exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely, it may be un-actionable puffery. However, specific and measurable claims and claims that may be literally true or false are not puffery, and may be the subject of deceptive advertising claims.") (citation and internal quotation marks omitted)). Implicit in Defendants' success stories is that potential customers

would receive patents and enter into lucrative licensing and manufacturing deals if they purchased Defendants' services.

Defendants argue that the FTC does not point to any marketing materials or scripts that make explicit promises that consumers will be successful; instead, they argue, WPM sales scripts focused on the potential for success. However, the record indicates that Defendants made both express and implied claims of financial success to consumers in telephonic and email communications. Although the FTC "need not present proof of subjective reliance by each victim," *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266–67 (citation omitted), or proof of actual deception to establish a violation of Section 5, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). Here, the FTC has submitted sworn affidavits and live testimony from WPM customers that detail their experiences with Defendants and reveal that Defendants' misrepresentations about relationships with major retailers and universities, "global patents," potential earnings, "success stories," "positive reviews," licensing and manufacturing deals, and the fees customers would be expected to pay gave WPM customers the net impression that Defendants would provide the promised services and results. Customers testified that they would not have retained WPM had they known that the Defendants' representations were false, especially that inventors touted as "success stories" were not in fact successful, and that WPM's products were not in fact sold in stores like Walmart, Home Depot, and Target.

Defendants also argue that they made numerous conspicuous disclaimers on their website and in marketing materials and contracts that warned consumers of the low likelihood of success in selling inventions and achieving financial success. They argue that these disclaimers should

shield them from liability and that they should trump the FTC's consumer declarations because the declarations are based on alleged oral statements. [ECF No. 37 at 27–28]. However, there are several problems with Defendants' arguments.

First, "[c]*aveat emptor* is not the law in this circuit." *IAB Mktg.*, 746 F.3d at 1233. In *IAB Marketing*, the Eleventh Circuit affirmed a preliminary injunction against defendants who sold trade-association memberships to consumers but led consumers to believe that they were purchasing major medical insurance. On appeal, the defendants argued, *inter alia*, that the disclosures they sent consumers following their purchases revealed that consumers had purchased memberships in a trade association offering medical-discount plans rather than major medical insurance. The Eleventh Circuit rejected the defendants' argument not only because the disclaimers were sent to consumers after they had made their purchases but also because "*caveat emptor* is not a valid defense to liability arising from misrepresentations." *IAB Mktg.*, 746 F.3d at 1233 (citing *Tashman*, 318 F.3d at 1277).

Second, even if *caveat emptor* were a valid defense, "[d]isclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." *Direct Mktg. Concepts*, 624 F.3d at 12; *see also FTC v. Capital Choice Consumer Credit*, No. 02-21050, 2003 WL 25429612, at *5 (S.D. Fla. June 2, 2003). Defendants' purported disclaimers did not appear prominently in contracts and were not discussed in telephone conversations. Indeed, Defendants did not make any disclaimers in the actual contracts customers signed for the Patent Package, PPPC, or SPB. *See, e.g.*, PX 1, Att. B, pp. 87–95; DX M. Although the GIRA's Marketability Study had a disclaimer, it was buried in the fifty-plus pages of the report, and lacked bolded,

underlined, or highlighted text.[4] *See FTC v. A to Z Mktg., Inc.*, No. 13-00919, 2014 WL 12479617, at *3 (C.D. Cal. Sept. 17, 2014) ("[M]isleading statements may not be sufficiently cured merely by the inclusion of disclaimers in small print."). Defendants' disclaimers on their website and in articles emailed to consumers similarly do not absolve Defendants of liability. A consumer who did not visit the website or regularly read WPM's emails might not have seen these disclosures.

Third, even if the disclaimers contained unambiguous disclosures, they failed to change the net impression created by Defendants' salespeople who verbally promised financial gain. *See Cyberspace.com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 924 n.15, 930 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008). WPM salespeople did not make any disclaimers in their initial telephone conversations with consumers, and the record lacks evidence of any sales scripts containing the disclaimers mentioned in Defendants' website or articles. *See IAB Mktg.*, 746 F.3d at 1233 ("IAB offers no authority for the proposition that disclosures sent to consumers after their purchases somehow cure the misrepresentations occurring during the initial sales.").

To the extent that consumers read Defendants' disclaimers, the disclaimers were contradicted by WPM salespeople who told consumers that WPM is "so selective" and rejects most ideas but that the company loved their ideas and thinks they have a lot potential. These representations were likely to cause confusion for consumers who, on the one hand, were told that the company believed their ideas would succeed, and on the other, read that most inventions fail. Indeed, a consumer processing such contradictory representations would likely believe that

---

[4]    InventBoost's disclaimer was similarly buried in the GIRA and was presented in fine print that lacked bolding, underlining, or highlighting. PX 4, Att. E.

because the invention industry is so difficult, retaining WPM's services would decrease the probability of failure and increase the likelihood of success. It is therefore not surprising that Masti testified that Cooper's statement and article on WPM's website about the invention industry's high failure rate made him "feel more comfortable about joining World Patent Marketing and their team and, you know, making my invention a success." HT at 58.

Finally, the Court rejects Defendants' argument that their disclaimers should trump the FTC's consumer declarations because the declarations are premised on uncorroborated oral statements. "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" *Levi Strauss*, 51 F.3d at 985 (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). "The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." *Asseo*, 805 F.2d at 26.

Moreover, Defendants' attempt to discredit the FTC's declarations is unavailing. Defendants hypothesize that the declarations "all read the same way . . . because the statements were fed to the declarants by FTC lawyers, or because there is a Facebook group where customers have discussed how to tailor their testimony and in which a staff attorney of the U.S. Patent and Trademark Office is a member." [ECF No. 74 at 2]. However, the declarations are based on personal knowledge and sworn to under penalty of perjury pursuant to 28 U.S.C. § 1746. Defendants' colorful theories fail to refute the FTC's declarations, especially because Defendants fail to provide any evidence rebutting the statements contained in the declarations. "This Court will not blindly accept the contentions of counsel where such contentions are not

supported by *any* evidence in the record." *FTC v. Consumer Collection Advocates Corp.*, No. 14-62491, 2015 WL 12533013, at *5 (S.D. Fla. Sept. 9, 2015).

The record supports the conclusion that the FTC is likely to succeed on the merits on its deception claim. Defendants' misrepresentations were deceptive under the FTC Act; they were likely to mislead consumers acting reasonably under the circumstances, and they were material to consumers' decision to purchase Defendants' services. The misrepresentations have induced customers to pay millions of dollars for useless and largely nonexistent services. It is especially troubling that in a little over two years, WPM had nearly $26,000,000 in gross revenue, yet no identifiable customers realized a profit, sold a meaningful number of units, or entered into significant licensing agreements as a result of using WPM's services. That Defendants' services may have provided some value to customers is of no consequence. Even assuming this were true, "liability for deceptive sales practices does not require that the underlying product be worthless." *IAB Mktg.*, 746 F.3d at 1233; *see also Figgie Int'l*, 994 F.2d at 606 ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them."). As the record demonstrates, Defendants' misrepresentations misled WPM customers, and unless Defendants are enjoined, their misrepresentations will continue misleading other consumers acting reasonably under the circumstances. *See FTC v. Primary Group Inc.*, No. 15-1645, 2015 WL 12976115, at *5 (N.D. Ga. June 8, 2015) ("Defendants' actions are likely to recur without injunctive relief because scripts containing false and deceptive representations in violation of the FDCPA were effective and used within the past several months.").

### 2.    Unfairness

An unfair act or practice is unlawful when it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not

outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

Congress designed the term "unfair" as a "flexible concept with evolving content," *FTC v. Bunte Bros.*, 312 U.S. 349, 353 (1941), and it "intentionally left [its] development . . . to the Commission rather than attempting to define the many and variable unfair practices which prevail in commerce." *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 367 (1965) (citation and internal quotation marks omitted); *see also Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 966 (D.C. Cir. 1985) (noting the FTC may exercise its discretion to ascertain which "acts or practices [ ] injuriously affect the general public" and "to prevent" such acts) (quoting H.R. REP. NO. 75-1613, at 3 (1937)).

In analyzing whether Defendants' consumer complaint suppression practices are unfair, this Court will consider facts relevant to the FTC's deceptive practices claim, as the FTC's theories of deception and unfairness are inextricably linked. *See Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir. 1988) ("[A] practice may be both deceptive and unfair . . ."); *FTC v. Wyndham Worldwide, Inc.*, 799 F.3d 236, 245 (3d Cir. 2015) ("[F]acts relevant to unfairness and deception claims frequently overlap."). Positive customer reviews are a valuable asset for companies seeking new customers because they have the potential to inspire trust in consumers otherwise apprehensive about purchasing an unfamiliar company's products and services. It is therefore not surprising that in marketing materials and on their website Defendants touted that they are an "A Rated Member of the Better Business Bureau" and that they are "the only patent services company in history to be awarded a five star review rating from Consumer Affairs, Google, Trustpilot, Shopper Approved, Customer Lobby and ResellerRatings.com." *See, e.g.*, PX 27, p. 2476. Indeed, Defendants treasured their ratings and resorted to threats and intimidation to preserve their reputable façade. These complaint

suppression tactics, in turn, have not only caused—but will likely continue to cause—substantial consumer injury because they serve to limit the flow of truthful information about the quality of Defendants' services to prospective consumers. This is especially salient in light of the manner in which the consumer complaint suppression practices worked to propagate the injurious effects of Defendants' misrepresentations. By depriving consumers of truthful, critical customer reviews and testimonials, Defendants' complaint suppression practices enabled them to deceive more consumers with their misrepresentations and sell more invention-promotion services than they might have otherwise. In essence, Defendants have instituted a positive feedback loop in which their unfair and deceptive practices reinforce each other. *See U.S. v. Microsoft Corp.*, 84 F. Supp. 2d 9, 20–21 (D.D.C. 1999) (defining positive feedback loops as barriers to entry in the context of antitrust litigation).

The record also supports the conclusion that the injuries caused by Defendants' consumer suppression practices are not reasonably avoidable by consumers. In an ideal setting, the marketplace is self-correcting and consumer choice governs the market. *Orkin Exterminating*, 849 F.2d at 1365 n.13 (citing FTC Unfairness Policy Statement, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. On Commerce, Sci., and Transp. (Dec. 17, 1980), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) [hereinafter FTC Unfairness Statement]). However, "corrective action may [ ] become necessary" when an act or practice "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." FTC Unfairness Statement, *supra* at 1074. Defendants' consumer complaint suppression tactics keep material, negative information hidden from prospective consumers, and such obstacles make it nearly impossible for consumers to make informed decisions. *See id.*

(explaining how sellers who withhold or fail to generate critical price or performance data . . . leav[e] buyers with insufficient information for informed comparisons").

Finally, countervailing benefits to competition or consumers do not outweigh the economic injury resulting from Defendants' complaint suppression practices. Indeed, no countervailing benefits exist: existing customers do not benefit from having their complaints suppressed and prospective consumers do not benefit from being denied access to material information. Moreover, by intimidating, threatening, and coercing consumers from reporting Defendants' misrepresentations, Defendants are able to hinder competition and harm legitimate competitors in the marketplace.

## C.    *Injunctive Relief Is in the Public Interest*

"The public interest in ensuring the enforcement of federal consumer protection laws is strong." *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011); *see also FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) ("[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."). Based on its review of the record, the Court concludes that the FTC has met its burden of proving that the equities favor a preliminary injunction against Defendants. The public interest in this case—enjoining conduct that violates the FTC Act, and preserving assets that may be used for restitution to victims who have suffered financial losses—is compelling and entitled to great weight. *See World Wide Factors*, 882 F.2d at 347  (affirming district court finding that "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment."). The record also reveals that contrary to Defendants' assertions, Defendants continue to violate the FTC Act in spite of changing business models, and as such, preliminary injunctive relief is appropriate under 15 U.S.C. § 53(b). The Court also accepts the Receiver's assessment that it is unlikely that

Defendants' business can be run profitably and lawfully. RR ¶¶ 137–45. The Court therefore finds that the FTC has met its burden of showing that injunctive relief is in the public interest.

### D. *An Asset Freeze is Appropriate*

In addition to injunctive relief, the FTC also seeks an asset freeze to preserve the availability of funds to provide monetary restitution for consumers victimized by Defendants' unlawful practices. "An asset freeze is within the district court's equitable powers." *IAB Mktg.*, 746 F.3d at 1234. The Eleventh Circuit has repeatedly upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress. *See, e.g.*, *IAB Mktg.*, 746 F.3d at 1234; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *U.S. Oil & Gas*, 748 F.2d at 1433–34. Moreover, "[t]he FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg.*, 746 F.3d at 1234, citing *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (per curiam). Only "a reasonable approximation of a defendant's ill-gotten gains" is required for an asset freeze and "[e]xactitude is not a requirement." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

Defendants' ill-gotten gains are measured as the amount of money that defendants wrongfully gained by their misrepresentations. *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1345 (11th Cir. 2008). Here, Defendants' potential monetary liability is approximately $26 million, yet the funds in the Receivership account total approximately $355,677. Additional frozen accounts and property, including two accounts in Switzerland, and Cooper's personal property, amount to approximately $2 million. *See* HT at 239–40, 260–61. The vast disparity between Defendants' substantial ill-gotten gains and the meager value of the frozen assets supports maintaining the asset freeze. *See FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1314 (S.D. Fla. 2013).

Defendants argue that the threshold inquiry in assessing the necessity of an asset freeze is whether there is a risk that Defendants will dissipate, conceal, or transfer away assets before a final judgment is rendered. However, the FTC does not need to present evidence that the assets will be dissipated; rather, it need only show a concern that the Defendants' assets will disappear. *IAB Mktg.*, 972 F. Supp. 2d at 1317 n.3, citing *ETS Payphones*, 408 F.3d at 734; *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001). The Court finds that the FTC has established, at this stage of the litigation, that there is a concern that Defendants will dissipate the assets if not enjoined. First, Cooper has the infrastructure and means to move millions of dollars around among his self-described holding companies. Second, even absent an illicit movement of assets, Defendants' request to unfreeze assets to pay for legal fees and living expenses constitutes a dissipation of assets, as these expenditures would deplete the assets available for consumer redress.[5] Dissipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress.

Defendants also argue that the asset freeze is too broad because the EIS Family accounts in Switzerland predate WPM's formation and hence are not attributable to the fraud, but that claim is unavailing. The court may freeze Defendants' assets even if the frozen assets are not traceable to Defendants' fraudulent activity. *See SEC v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006) ("[T]here is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit" (citation and alteration omitted)); *Kemp v. Peterson*, 940 F.2d 110, 113–14 (4th Cir. 1991) ("[S]ince the district court's order was preliminary in nature, pending a final determination of liability, the freezing of funds . . . may be proper without respect to whether those monies are traceable to proceeds or profits and income from the proceeds").

---

[5] The Court also notes that Cooper is able to seek lawful employment to cover his legal defense and living expenses during the pendency of this FTC action. *See IAB Mktg.*, 972 F. Supp. 2d at 1314.

### E. *Continued Appointment of a Receiver*

The Court has authority to appoint a receiver for the Corporate Defendants pursuant to the Court's equitable powers under Section 13(b) of the FTC Act. *U.S. Oil & Gas*, 748 F.2d at 1432. The appointment of a receiver is appropriate where, as here, there is "imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone Indus. v. Assoc. Packaging*, 795 F. Supp. 117, 120 (D.N.J. 1992). When a defendant has used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste," to the detriment of victims. *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981); *see also IAB Mktg.*, 746 F.3d at 1232, 1236 (affirming preliminary injunction with the appointment of a receiver).

As noted above, the Receiver has determined that it is unlikely WPM can be run lawfully and profitably. RR ¶ 145. Nonetheless, Defendants ask that the Court discharge the Receiver or convert his role into that of a monitor. Neither is appropriate. The record clearly reflects a continued need for the Receiver in this action to preserve assets and maintain the status quo, and because legal remedies are inadequate. The Receiver is also necessary to determine the full extent of Defendants' deceptive and unfair practices, identify the victims of Defendants' scheme, and prevent further fraudulent practices during the pendency of the preliminary injunction.

## IV.   CONCLUSION

The record supports a preliminary finding that Defendants devised a fraudulent scheme to use consumer funds to enrich themselves. Accordingly, the Court finds a preliminary injunction is necessary to maintain the status quo pending a trial on the merits.

It is therefore **ORDERED AND ADJUDGED** as follows:

## A.    *Prohibition on Misrepresentations*

Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, whether acting directly or indirectly in connection with the advertising, marketing, promotion, offering for sale, or sale of any products or services, are **hereby preliminarily restrained and enjoined** from making any false or unsubstantiated representations, expressly or by implication, regarding any material fact, including, but not limited to:

(1) Purchase of Defendants' invention-promotion services is likely to result in financial gain for their customers;

(2) Defendants have successfully marketed the invention ideas of many of their customers, resulting in royalties or sales of their inventions;

(3) Defendants successfully marketed specific invention ideas, such as Teddy's Ballie Bumpers, Live Expert Chat, and Supreme Diva Jeans;

(4) Consumers who buy one of Defendants' "global" packages will receive a globally-applicable patent;

(5) Defendants have regularly negotiated licensing and manufacturing agreements that have resulted in the manufacture and sale of their customers' inventions;

(6) Consumers who buy Defendants' invention-promotion services will not have to pay any more money to receive Defendants' promised services; and

(7) Defendants' "review team" approves customer ideas and rejects a large number of them.

## B.    *Prohibition on Complaint Suppression*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, whether acting directly or indirectly, are **hereby preliminarily restrained and enjoined** from making any threats or intimidating any person concerning complaints or comments about products or services offered or sold by

Defendants, including but not limited to requesting that negative comments be withdrawn or removed.

**C.** *Conduct Prohibitions regarding Marketing*

**IT IS FURTHER ORDERED** that Defendants and their Representatives, whether acting directly or indirectly, in connection with the marketing, advertising, promotion, distribution, offering for sale, or sale of any goods or services, are hereby preliminarily restrained and enjoined from using any false or misleading statement to induce any person to pay for goods or services.

**D.** *Asset Freeze*

**IT IS FURTHER ORDERED** that Defendants and their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, whether acting directly or indirectly, are **hereby preliminarily restrained and enjoined** from:

(1) Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, conveying, gifting, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, consumer lists, shares of stock, or other assets, or any interest therein, wherever located, whether within the United States or within a jurisdiction outside the United States, that are:

    (a) owned or controlled, directly or indirectly, by any of the Defendants, in whole or in part;

    (b) held, in whole or in part, for the benefit of any Defendant;

    (c) in the actual or constructive possession of any Defendant; or

    (d) owned, controlled by, or in the actual or constructive possession of, or otherwise held for the benefit of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant, or any entity acting under a fictitious name owned by or controlled by any Defendant, including, but not limited to, any assets held by or for, or subject to access by any Defendant at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company,

precious metals dealer, or other financial institution or depository institution of any kind;

(2) Opening or causing to be opened any safe deposit boxes titled in the name of, or subject to access by, any Defendant;

(3) Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Corporate Defendant;

(4) Obtaining a loan encumbering the assets of any Defendant, or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant;

(5) Incurring liens or other encumbrances on real property, personal property or other assets titled in the name, singly or jointly, of any Defendant or any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant; and

(6) Cashing any checks or depositing any money orders, cash, or any other payment (including credit card and debit card payments) received from consumers, clients, or customers of any Defendant.

*Provided*, that the assets affected by this Section shall include: (1) all assets of any Defendant; and (2) for assets obtained after the date and time this Order was entered, only those assets that are derived, directly or indirectly, from Defendants' activities as alleged in the FTC's Complaint or prohibited by this Order.

**E.**     ***Duties of Asset Holders***

**IT IS FURTHER ORDERED** that any financial or brokerage institution, credit card processing company, payment processor, merchant bank, acquiring bank, independent sales organization, business entity, or person served with a copy of this Order, or who otherwise has actual knowledge of this Order, that (a) holds, controls or maintains custody of any account, safe deposit box, post office box, or other asset of any Defendant, (b) holds, controls, or maintains custody of any asset associated with credits, debits, or charges made on behalf of any Defendant, including, but not limited to, reserve funds held by payment processors or other entities, or (c)

has held, controlled, or maintained any such account, safe deposit box, or other asset at any time since the date of entry of this Order shall:

(1) Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset, except by further order of the Court;

(2) Deny any person, except the Receiver acting pursuant to Section XIV of this Order (Receiver's Duties and Authority), access to any safe deposit box that is titled in the name of, individually or jointly, or otherwise subject to access by, any Defendant;

(3) If they have not done so already in compliance with the Temporary Restraining Order previously issued in this matter, provide FTC counsel and the Receiver, within five (5) business days of receiving a copy of this Order, a sworn statement setting forth:

   (a) The identification number of each such account or asset titled in the name, individually or jointly, of any Defendant, or held on behalf of or for the benefit of any Defendant;

   (b) The balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

   (c) The identification of any safe deposit box that is titled in the name of, individually or jointly, or otherwise subject to access by any Defendants; and

(4) If they have not done so already in compliance with the Temporary Restraining Order previously issued in this matter, upon request by the FTC or the Receiver, promptly provide the FTC and the Receiver with copies of all records or other documentation pertaining to each such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.

### F.     *Repatriation of Assets and Documents*

**IT IS FURTHER ORDERED** that, if they have not done so already in compliance with the Temporary Restraining Order issued in this matter, within five (5) days following the service of this Order, each Defendant shall:

(1) Provide the FTC and the Receiver with a full accounting of all funds, documents, and assets outside of the United States which are: (1) titled in the name, individually or jointly, of any Defendant; or (2) held by any person or entity for the benefit of any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant;

(2) Transfer to the territory of the United States and deliver to the Receiver all funds, documents, and assets located in foreign countries which are: (1) titled in the name individually or jointly of any Defendant; or (2) held by any person or entity, for the benefit of any Defendant; or (3) under the direct or indirect control of any Defendant, whether jointly or singly;

## G.    *Non-Interference with Repatriation*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, whether acting directly or indirectly, are **hereby preliminarily restrained and enjoined** from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation required by Section F (Repatriation of Assets and Documents) of this Order, including, but not limited to:

(1) Sending any statement, letter, fax, e-mail or wire transmission, telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all assets have been fully repatriated pursuant to Section F of this Order; or

(2) Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a court order, until such time that all assets have been fully repatriated pursuant to Section F of this Order.

## H.    *Consumer Credit Reports*

**IT IS FURTHER ORDERED** that pursuant to Section 604(a)(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(a)(1), any consumer reporting agency served with this Order shall promptly furnish consumer credit reports as requested concerning any Defendant and any

spouse of a Defendant to the FTC.  The Commission may also directly access any Defendant's consumer credit report.

## I.  *Preservation of Records*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, are **hereby preliminarily restrained and enjoined** from:

(1) Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, documents that relate to: (1) the business, business practices, assets, or business or personal finances of any of the Defendants, (2) the business practices or finances of entities directly or indirectly under the control of any of the Defendants, or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant, including any and all marketing materials, websites and webpages, consumer complaints, customer records, rate decks, call detail records, telephone logs, telephone scripts, contracts, correspondence, email, corporate books and records, accounting data, financial statements, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, calendars, appointment books, and tax returns; and

(2) Failing to create and maintain documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of Defendants' assets.

## J.  *Notification of New Business Activity*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, are **hereby preliminarily restrained and enjoined** from creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing FTC counsel with a written statement disclosing:  (1) the name of the business entity; (2) the address and telephone

number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, members, and employees; and (4) a detailed description of the business entity's intended activities.

### K.    *Prohibition on Release of Consumer Information*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, are **hereby preliminarily restrained and enjoined** from selling, renting, leasing, transferring, using, disclosing, or otherwise benefitting from the name, address, telephone number, credit card number, bank account number, email address, or other identifying information of any person who:  (1) paid money to any Defendant; (2) was previously contacted by Defendants in connection with invention promotion services, including, but not limited to research, patenting, invention licensing, manufacturing, or marketing; or (3) was on a list to be contacted by Defendants.

*Provided, however*, that Defendants may disclose such identifying information to a law enforcement agency or as required by any law, regulation, or court order.

### L.    *Appointment of Permanent Receiver*

**IT IS FURTHER ORDERED** that Jonathan Perlman is appointed receiver for the Corporate Defendants, as well as for any affiliates, subsidiaries, divisions, or telephone sales or customer service operations, wherever located, with the full power of an equity receiver.  The Receiver shall be the agent of this Court, and solely the agent of this Court, in acting as Receiver under this Order.  The Receiver shall be accountable directly to this Court.

**M.** *Receiver's Duties and Authority*

**IT IS FURTHER ORDERED** that the Receiver is authorized and directed to accomplish

the following:

(1) Retain full control of the Corporate Defendants by removing, as the Receiver deems necessary or advisable, any director, officer, independent contractor, employee, or agent of any of the Corporate Defendants, including any Defendant, from control of, management of, or participation in, the affairs of the Corporate Defendants;

(2) Retain exclusive custody, control, and possession of all assets and documents of, or in the possession, custody, or under the control of, the Corporate Defendants, wherever situated. The Receiver shall have full power to divert mail and to sue for, collect, receive, take in possession, hold, and manage all assets and documents of the Corporate Defendants and other persons or entities whose interests are now under the direction, possession, custody, or control of, the Corporate Defendants. The Receiver shall assume control over the income and profits therefrom and all sums of money now or hereafter due or owing to the Corporate Defendants. *Provided, however*, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer was a victim of the unfair or deceptive acts or practices or other violations of law alleged in the Complaint in this matter, without prior Court approval;

(3) Take all steps necessary to secure each location from which the Corporate Defendants operate their business. Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable: (1) serving this Order; (2) completing a written inventory of all receivership assets; (3) obtaining pertinent information from all employees and other agents of the Corporate Defendants, including, but not limited to, the name, home address, Social Security Number, job description, passwords or access codes, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) photographing and videotaping any or all portions of the location; (5) securing the location by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at that location; and (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises documents or assets of the Corporate Defendants. Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security. If requested by the Receiver, the United States Marshals Service will provide appropriate and necessary assistance to the Receiver to implement this Order and is authorized to use any necessary and reasonable force to do so;

(4)   Suspend business operations of the Corporate Defendants if in the judgment of the Receiver such operations cannot be continued legally and profitably;

(5)   Conserve, hold, and manage all assets of the Corporate Defendants, and perform all acts necessary or advisable to preserve the value of those assets in order to prevent any irreparable loss, damage, or injury to consumers or creditors of the Corporate Defendants, including, but not limited to, obtaining an accounting of the assets and preventing the unauthorized transfer, withdrawal, or misapplication of assets;

(6)   Enter into contracts and purchase insurance as advisable or necessary;

(7)   Prevent the inequitable distribution of assets and determine, adjust, and protect the interests of consumers and creditors who have transacted business with the Corporate Defendants;

(8)   Prevent the destruction or erasure of any web page or website registered to and operated, in whole or in part, by the Corporate Defendants, directly or indirectly;

(9)   Prevent the destruction or erasure of any of the Corporate Defendants' marketing materials, sales scripts, training materials, customer information, call logs, and any other documents or records that reflect marketing, advertising, promotion, distribution, and offers for sale or sale of services;

(10)  Prevent the destruction or erasure of any of the Corporate Defendants' corporate records, business records, financial records, and financial transactions as they relate to the practices charged in the FTC's Compliant and ensure that all such documents are preserved;

(11)  Manage and administer the business of the Corporate Defendants until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes but is not limited to retaining, hiring, or dismissing any employees, independent contractors, or agents;

(12)  Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

(13)  Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order.  The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Corporate Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure assets of the Corporate Defendants, such as rental payments;

(14) Institute, compromise, adjust, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the assets of the Corporate Defendants, or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order, including, but not limited to, actions challenging fraudulent or voidable transfers;

(15) Defend, compromise, adjust, or otherwise dispose of any or all actions or proceedings instituted in the past or in the future against the Receiver in his role as Receiver, or against the Corporate Defendants, as the Receiver deems necessary and advisable to preserve the assets of the Corporate Defendants, or as the Receiver deems necessary and advisable to carry out the Receiver's mandate under this Order;

(16) Issue subpoenas to obtain documents and records (including but not limited to Google, Inc.) pertaining to the Receivership, and conduct discovery in this action on behalf of the Receivership estate;

(17) Open or maintain one or more bank accounts as designated depositories for funds of the Corporate Defendants. The Receiver shall deposit all funds of the Corporate Defendants in such a designated account and shall make all payments and disbursements from the Receivership estate from such an account. The Receiver shall serve copies of monthly account statements on all parties;

(18) Maintain accurate records of all receipts and expenditures incurred as Receiver;

(19) Cooperate with reasonable requests for information, documents, materials, or assistance from any state or federal law enforcement agency;

(20) File reports with the Court on a timely basis and at regular intervals or as otherwise directed by the Court;

(21) Allow the Plaintiff's representatives, agents, and assistants, as well as Defendants' Representatives and Defendants themselves, reasonable access to the premises of the Receivership Defendants, or any other premises where the Receivership Defendants conduct business operations. The purpose of this access shall be to inspect and copy any and all books, records, documents, accounts, and other property owned by, or in the possession of, the Receivership Defendants or its agents. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access; and

(22) Allow the Plaintiff's representatives, agents, and assistants, as well as Defendants' Representatives and Defendants themselves, reasonable access to documents in the possession, custody, or control of the Receivership Defendants, or on their behalf, including, but not limited to, books, records, tapes, discs, accounting data, checks, correspondence, forms, advertisements, brochures, manuals, electronically stored data, banking records, customer lists, customer files, invoices, telephone records,

ledgers and payroll records, and any other document or record that relates to the business practices or finances of the Receivership Defendants, including electronically stored information (such as electronic mail).

**N.** *Transfer of Receivership Property to the Receiver*

**IT IS FURTHER ORDERED** that:

(1) Immediately upon service of this Order upon them, or within a period permitted by the Receiver, if they have not done so already in compliance with the Temporary Restraining Order previously issued in this matter, Defendants, Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, and any other person with possession, custody or control of property or of records relating to the Corporate Defendants, shall transfer or deliver possession, custody, and control of the following to the Receiver:

    (a) All assets of the Corporate Defendants;

    (b) All documents of the Corporate Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

    (c) All assets belonging to other persons or entities whose interests are now under the direction, possession, custody, or control of the Corporate Defendants;

    (d) All computers and data in whatever form used to conduct the business of the Corporate Defendants; and

    (e) All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of the Corporate Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, or other property.

(2) In the event any person or entity fails to deliver or transfer any asset or otherwise fails to comply with any provision of this Section, the Receiver may file *ex parte* an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshals Service or any sheriff or deputy sheriff of any county to seize the asset, document, or other item and to deliver it to the Receiver.

## O.   *Provision of Information to the Receiver*

**IT IS FURTHER ORDERED** that Defendants, if they have not done so already in compliance with the Temporary Restraining Order previously issued in this matter, shall provide to the Receiver, immediately upon request, the following:  (1) a list of all assets and property, including accounts, of the Corporate Defendants that are held in any name other than the name of a Corporate Defendant, or by any person or entity other than a Corporate Defendant; and (2) a list of all agents, employees, officers, servants or those persons in active concert and participation with the Individual Defendants and Corporate Defendants who have been associated with or done business with the Corporate Defendants.

## P.   *Cooperation with the Receiver*

**IT IS FURTHER ORDERED** that Defendants and Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, shall fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of the assets of the Corporate Defendants.  This cooperation and assistance shall include, but not be limited to:  (1) providing information to the Receiver that the Receiver deems necessary in order to exercise the authority and discharge the responsibilities of the Receiver under this Order; (2) providing any password required to access any computer, electronic file, or telephonic data in any medium; (3) advising all persons who owe money to the Corporate Defendants that all debts should be paid directly to the Receiver; and (4) transferring funds at the Receiver's direction and producing records related to the assets and sales of the Corporate Defendants.

The entities obligated to cooperate with the Receiver under this provision include, but are not limited to, banks, broker-dealers, savings and loans, escrow agents, title companies,

commodity trading companies, precious metals dealers and any financial institutions and depositories of any kind, payment processors, payment gateways, insurance companies, as well as all third-party billing agents, common carriers, and other telecommunications companies.

**Q.** *Interference with the Receiver*

**IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, attorneys, and all other persons in active concert or participation with any Defendant, who receive actual notice of this Order, and their corporations, subsidiaries, divisions, or affiliates, are **hereby restrained and enjoined** from directly or indirectly:

(1) Interfering with the Receiver managing, or taking custody, control, or possession of the assets or documents subject to this Receivership;

(2) Transacting any of the business of the Corporate Defendants or any substantially similar name;

(3) Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Corporate Defendants, or the Receiver;

(4) Destroying, secreting, defacing, transferring, or otherwise altering or disposing of any documents of the Corporate Defendants, including, but not limited to, books, records, accounts, or any other papers;

(5) Excusing debts owed to the Corporate Defendants;

(6) Refusing to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court; and

(7) Harassing or interfering with the Receiver in any way.

**R.** *Stay of Actions against Corporate Defendants*

**IT IS FURTHER ORDERED** that except by leave of this Court, during pendency of the Receivership ordered herein, Defendants, their Representatives, and all investors, creditors, stockholders, lessors, customers and other persons seeking to establish or enforce any claim,

right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the assets or documents of the Corporate Defendants, including, but not limited to:

(1) Petitioning, or assisting in the filing of a petition, that would cause any Corporate Defendant to be placed in bankruptcy;

(2) Commencing, prosecuting, or continuing a judicial, administrative, or other action or proceeding against the Corporate Defendants, including the issuance or employment of process against the Corporate Defendants, except that such actions may be commenced if necessary to toll any applicable statute of limitations;

(3) Filing or enforcing any lien on any asset of the Corporate Defendants; taking or attempting to take possession, custody, or control of any asset of the Corporate Defendants; accelerating the due date of any obligation; or attempting to foreclose, forfeit, alter, or terminate any interest in any asset of the Corporate Defendants, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise; or

(4) Initiating any other process or proceeding that would interfere with the Receiver managing or taking custody, control, or possession of, the assets or documents subject to this receivership.

*Provided that,* this Order does not stay: (1) the commencement or continuation of a criminal action or proceeding; (2) the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power; or (3) the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

### S.     *Compensation of Receiver*

**IT IS FURTHER ORDERED** that the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by or in the possession

or control of or which may be received by the Corporate Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of entry of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

**T.** *Service on Financial Institutions, Entities, or Persons*

**IT IS FURTHER ORDERED** that copies of this Order and the initial pleadings filed in this case may be served upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any Defendant, or that may otherwise be subject to any provision of this Order, by FTC employees, by employees of any other law enforcement agency, by agents of the FTC or by agents of any process service retained by the FTC. This Order and the initial pleadings filed in this matter may be served upon any financial institution or other entity or person that may have possession, custody, or control of any documents or assets of any Defendant, or that may otherwise be subject to any provision of this Order, by any means, including facsimile transmission, e-mail, and overnight delivery service. Service upon any branch or office of any financial institution shall effect service upon the entire financial institution.

**U.** *Defendants' Duty to Distribute Order*

**IT IS FURTHER ORDERED** that Defendants shall immediately provide a copy of this Order to each of their affiliates, subsidiaries, divisions, sales entities, successors, assigns, officers, directors, employees, independent contractors, client companies, agents, attorneys, spouses, and representatives, and shall, within three (3) days from the date of entry of this Order, provide the FTC with a sworn statement that: (1) confirms that Defendants have provided copies

of the Order as required by this paragraph; and (2) lists the names and addresses of each entity or person to whom Defendants provided a copy of the Order. Furthermore, Defendants shall not take any action that would encourage officers, agents, directors, employees, salespersons, independent contractors, attorneys, subsidiaries, affiliates, successors, assigns or other persons or entities in active concert or participation with them to disregard this Order or believe that they are not bound by its provisions.

**V.** *Retention of Jurisdiction*

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of August, 2017.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE